## WOOD VS. THE STATE.

1. LARCENY: *Drunkenness, when a defense.*
   If one, at the time of taking property, is so under the influence of intoxicating liquor that a felonious intent can not be formed in his mind, he is not guilty of larceny.

Wood vs. The State.

2. CRIMINAL PRACTICE: *New trial for improper conduct of jury.*

When evidence is adduced, and shows that a jury, in a criminal case, exposed to improper influences, were not in any way influenced, biased or prejudiced by the exposure, the verdict will not be disturbed; but unless it is proven that it failed of an effect, the verdict will be set aside.

APPEAL from *Johnson* Circuit Court.

Hon. W. D. JACOWAY, Circuit Judge.

*Henderson,* Attorney General, for the State.

HARRISON, J.    The appellant was tried and convicted of the crime of grand larceny in stealing a pistol, the property of one Cheek.

The pistol, which was of the value of $8, was taken from the room of the owner, at a hotel, and out of a coat pocket, on the night of the fifth of August, 1879; and was, on the fifteenth of the same month, found in the defendant's possession.

The defendant, a lawyer, had been for three or four years very intemperate, and for several weeks before he was found with the pistol in his possession, almost continuously drunk. On the night of the fifteenth of August, he was very drunk — according to one of the witnesses, crazy drunk — and the constable, learning that he had a pistol, to prevent his doing harm, took it from him, when it was found to be the pistol that had been taken from Cheek's room.   When it was taken from the defendant, he said it had been given him by one Hamp. Lane, who had then, as was proven at the trial, left the county.   Several witnesses testified that the defendant's conduct during his spree, or drunkenness, was strange and unnatural — quite different from such as is the effect of ordinary drunkenness — and that he appeared demented to some degree.   One of them, a physician, who

had known him two or three years, said that there were times during his spree when he thought he did not know what he was about, and he believed his mind, by long and excessive indulgence in ardent spirits, had become impaired; and another physician, who was called to see him on the seventeenth of August, the day after his arrest, said he found him suffering with symptoms of *mania a potu*, and that the functions of the brain were partially paralyzed.

It was proven that the defendant had previously borne a good character for honesty and integrity.

The court was asked to instruct the jury for the defendant that, if they believed, from the evidence, the defendant took the pistol, but that at the time he was so under the influence of intoxicating liquor, a felonious intent could not have been formed in his mind, they should find him not guilty; which instruction the court refused to give.

As a general doctrine, voluntary intoxication furnishes no excuse for crime, even when the intoxication is so extreme as to make the person unconscious of what he is doing. "Perhaps no better illustration of the doctrine," says Mr. Bishop, " can be given than to state its application in ordinary cases of homicide. The common law divides all indictable homicides into murder and manslaughter; but the specific intent to kill is not necessary in either. A man may be guilty of murder without intending to take life. He may be guilty of manslaughter without so intending; or he may intend to take life, yet not commit any crime in taking it. Now the doctrine of the courts is, that the intention to drink may fully supply the place of malice aforethought; so that if one voluntarily becomes so drunk as not to know what he is about, and then with a deadly weapon kills a man, the killing will be murder, the same as if he were sober. In other words, the mere fact of drunkenness will not alone

reduce to manslaughter a homicide which would otherwise be murder, much less extract from it altogether its indictable quality." *1 Bish. Crim. Law, sec. 401.* But he says that, "in cases where the law requires, not general malevolence, but a specific intent to commit the particular act, which intent must concur with the act in point of time, in order to constitute the offense charged against a prisoner, he can not be guilty, if, at the time when the act transpired, he was so drunk as to be incapable of entertaining such intent." *Ib., sec. 408.*

"Intoxication is no excuse for crime," said Judge Baldwin, in *United States v. Roudenbush,* "when the offense consists merely in doing a criminal act, without regarding intention. But when the act done is innocent in itself, and criminal only when done with a corrupt or malicious motive, a jury may, from intoxication, presume that there was a want of criminal intention; that the reasoning faculty, the power of discrimination between right and wrong, was lost in the excitement of the occasion. But if the mind still acts; if its reasoning and discriminating faculty remain, a state of partial intoxication affords no ground of a favorable presumption in favor of an honest or innocent intention, in cases where a dishonest and criminal intention would be fairly inferred from the commission of the same act when sober." *United States v. Roudenbush, 1 Baldw., 517.*

In larceny, there must be a concurrence with the act— an intent to do it—and also a felonious intent; and the same author we have quoted, says: "A bare intentional trespass not being larceny, but the specific intent to steal being necessary, also, if one who is too drunk to entertain this specific intent takes property, relinquishing it before the intent could arise in his mind, there is no larceny."

*Sec. 411; Wing v. The State, 1 Tex. Ct. App., 36; Johnson v. The State, ib., 146; Lozar v. The State, ib., 488.*

The instruction should have been given.

During the trial, the officer in charge of the jury took them to his drug store and treated them to whisky, and all of them, except two drank. He also at night took them to a billiard saloon, where they remained a half hour, and on Sunday, took them in a hack five or six miles in the country to church. And the prosecuting attorney loaned one of them a shirt. It was proven that when they were taken to the billiard saloon, they sat together, and the officer drew a chalk line between them and the crowd in the saloon, and that there was no intermingling between them and the persons there; and that when at church, they were kept together, and not permitted to disperse.

In *Thompson v. The State, 26 Ark., 398,* the court say: "The conclusion to be derived from the former decisions of this court, and which seems to be well supported by the authorities, as to the consequence of the misconduct of the jury, in cases of mere exposure to improper influences, we understand to be this: Where evidence is adduced, and shows that the jury were not in any way influenced, biased or prejudiced by the exposure, the verdict will not be disturbed; but unless it is proven that it failed of an effect, the presumption will be against the purity of the trial, and the verdict will be set aside."

What improper influences may have had an effect upon the views of the jury, can not be known. That they were exposed to none, can not with certainty be said.

Such conduct can not be too strongly reprehended and condemned. It was trifling with a most serious and important duty, and calculated to throw doubt and suspicion upon the fairness of the trial, and to degrade the adminis-

tration of justice; and for it, as well as for the error before noticed, the verdict should have been set aside.

The judgment is reversed, and the cause remanded, with instructions to grant the defendant a new trial.