[No. S030759. Feb. 28, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
STEPHEN MARTIN WHITFIELD, Defendant and Appellant.

## Counsel

Stefanie A. Sada, under appointment by the Supreme Court, for Defendant and Appellant.

Madeline McDowell and John T. Philipsborn as Amici Curiae on behalf of Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster, Keith I. Motley, Garrett Beaumont and Janelle B. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

Kent S. Scheidegger and Charles L. Hobson as Amici Curiae on behalf of Plaintiff and Respondent.

## Opinion

**GEORGE, J.**—We granted review in this case to resolve a conflict in decisions of the Courts of Appeal regarding whether, under Penal Code section 22,[1] evidence of voluntary intoxication is admissible in a prosecution for second degree murder when the prosecution seeks to establish the existence of malice aforethought on an implied malice theory, i.e., seeks to prove that the defendant acted with knowledge of the danger to human life and in conscious disregard of human life. For the reasons that follow, we hold that evidence of voluntary intoxication is admissible under section 22 with regard to the question whether the defendant harbored malice aforethought, whether such malice is express or implied.

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

We further hold that the trial court in this case correctly instructed the jury as to the proper use of evidence of voluntary intoxication in determining whether defendant was guilty of second degree murder or, instead, of gross vehicular manslaughter while intoxicated (§ 191.5), and did not err in refusing to provide an additional instruction, requested by defendant, concerning whether defendant was unconscious at the time of the killing. Accordingly, we affirm the judgment of the Court of Appeal upholding defendant's conviction of second degree murder.

I

Defendant was charged by amended information with murder (§ 187), driving under the influence of alcohol or drugs (Veh. Code, § 23152, subd. (a)) within seven years of having suffered three previous convictions for a similar offense (Veh. Code, § 23175), driving with a blood-alcohol content of .08 percent or more (Veh. Code, § 23152, subd. (b)) within seven years of having suffered three previous convictions for a similar offense (Veh. Code, § 23175), and driving while his privilege to drive was suspended or revoked for driving under the influence of alcohol or drugs (Veh. Code, § 14601.2, subd. (a)).

The evidence admitted at trial included the following. In 1989, pursuant to the sentence imposed upon his being convicted a second time for driving under the influence of alcohol, defendant attended several sessions of a program for repeat offenders and viewed a film that graphically depicted the carnage caused by intoxicated drivers, including footage of scenes of accidents caused by such drivers and interviews with relatives of persons who had been killed in this manner. On March 5, 1990, defendant suffered his third conviction for driving under the influence of alcohol.

Shortly after 1 p.m. on Saturday, November 17, 1990, defendant was driving on Van Buren Boulevard in Riverside County. Frank Diaz III, who was driving behind defendant, observed defendant's vehicle swerve in and out of the left lane and over the double yellow line dividing the road.

Frank Falbo was driving in the opposite direction on Van Buren Boulevard when defendant's vehicle swerved over the double yellow line, almost colliding with Falbo's automobile, then continued straddling the double yellow line, occupying three-quarters of the oncoming lane, and collided head-on with a vehicle driven by 21-year-old Ronald Lawrence Kinsey. Kinsey was killed.

Defendant was found unconscious on the front seat of his vehicle. He smelled strongly of an alcoholic beverage. Several empty 16-ounce cans of

malt liquor were on the floor of the vehicle. He was taken to a hospital for treatment of his injuries, the most serious of which was a collapsed lung. A hospital employee informed defendant he had killed someone.

At approximately 3 p.m., a sample of defendant's blood was withdrawn at the request of the police. The technician who extracted the blood heard defendant exclaim: "Take me straight to the gas chamber, [I] killed somebody." Analysis of the blood sample revealed a blood-alcohol content of .24 percent.

Defendant did not dispute the prosecution's evidence establishing that he was under the influence of alcohol. To the contrary, defendant sought to prove that he did not harbor implied malice aforethought because he was so intoxicated that he was unconscious at the time the accident occurred. Accordingly, defense counsel elicited testimony demonstrating that, because the amount of alcohol in a person's system dissipates over time, defendant's blood-alcohol content would have been .27 percent about the time of the collision, and that individuals with blood-alcohol levels above .25 percent may become stuporous and lose consciousness. Defendant also introduced evidence indicating that an independent laboratory's analysis of the blood sample withdrawn at the request of the police, and an analysis by the hospital of a separate blood sample, revealed even higher blood-alcohol levels.

Lorena Lee testified for the defense that she drove past defendant's vehicle immediately prior to the accident and observed that defendant's head was nodding "like he was fighting sleep."

Defendant offered the testimony of a paramedic who arrived at the scene of the accident and found defendant unconscious. When defendant regained consciousness a short time later, he was incoherent, his speech was incomprehensible, and his breath smelled strongly of an alcoholic beverage. The paramedic acknowledged that defendant's apparent lack of comprehension and mumbled speech might have resulted from the accident, but he believed they were due to defendant's consumption of alcohol.

Clinical psychologist Dr. Craig Rath testified for the defense that blood-alcohol levels from .09 percent to .25 percent impair a person's memory and ability to make critical judgments and to predict the effects of one's actions. At blood-alcohol levels from .25 percent to .40 percent, a majority of individuals will become stuporous and lose consciousness, although their eyes may remain open and they may continue to function physically and even be able to operate a motor vehicle. Dr. Rath opined that a person could

be capable of operating a motor vehicle even though he or she was incapable of conscious decisionmaking due to alcohol consumption.

On rebuttal, the prosecution introduced evidence establishing that, when questioned by police officers two days after the collision, defendant stated that during the morning of the day of the collision, he consumed the contents of two 16-ounce cans of malt liquor at his home and then drove his children to his mother's house. He purchased two more cans of malt liquor near his mother's house and consumed their contents as well. Defendant subsequently left his children with his mother and was driving home when the accident occurred. He did not remember the collision. The prosecution offered expert testimony establishing that the amount of alcohol defendant admitted having consumed was insufficient to produce a blood-alcohol level of .24 percent.

The trial court's instructions to the jury included the following. For the crime of murder "there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator." (CALJIC No. 3.31.) "If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider the fact of intoxication, including the degree of intoxication, in determining whether defendant had such specific intent or mental state." (See CALJIC No. 4.21.) "Every person who unlawfully kills a human being with malice aforethought is guilty of the crime of murder . . . ." (CALJIC No. 8.10.) " 'Malice' may be either express or implied. Malice is express when there is manifested an intention unlawfully to kill a human being. [¶] Malice is implied when: [¶] 1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to and with conscious disregard for human life." (CALJIC No. 8.11.)

"The intentional act required for 'implied malice' underlying vehicle murder is not the traffic violation which may precede a collision, but whether the defendant was driving under the influence with a conscious disregard for human life." (Special instruction requested by the prosecution.) "In order to convict defendant of second-degree murder you must examine defendant's state of mind at the time of the act. This is referred to as a subjective test. Second-degree murder based on implied malice requires that defendant acted deliberately, that defendant acted with knowledge of the danger to human life, and that defendant acted in conscious disregard for human life." (Special instruction requested by defendant.) "If a person causes another's death by doing a dangerous act in an unlawful or criminally negligent manner, without realizing the risk involved, he is guilty of manslaughter. If, on the other hand, the person realized the risk and acted in

conscious disregard of the danger to human life, malice is implied and the crime is murder." (See CALJIC No. 8.51.) In addition, the trial court carefully distinguished the mental state required for murder (implied malice) from the mental state required for the lesser offense of gross vehicular manslaughter (gross negligence). (§ 191.5.)[2]

The trial court refused defendant's request that the jury be instructed, pursuant to CALJIC No. 8.47, that "[i]f you find that a defendant, while unconscious as a result of voluntary intoxication, killed another human being without intent to kill and without malice aforethought, the crime is involuntary manslaughter."

The jury found defendant guilty as charged on all counts, fixing the degree of the murder as second degree, and the trial court sentenced defendant to prison for a term of 18 years to life.

On appeal, defendant asserted, among other contentions, that the trial court erred in refusing to instruct the jury pursuant to CALJIC No. 8.47 concerning unconsciousness caused by voluntary intoxication. The Court of Appeal affirmed the conviction, observing that, pursuant to section 22, only when a specific intent crime is charged is evidence of voluntary intoxication admissible to demonstrate that a defendant did not harbor malice aforethought, and holding that second degree murder based upon implied malice is not a specific intent crime. Accordingly, the Court of Appeal concluded that the trial court did not err in refusing defendant's requested jury instruction regarding unconsciousness due to voluntary intoxication. In the view of the Court of Appeal, the trial court erred *in defendant's favor* by instructing

---

[2]The trial court instructed the jury as follows. "Gross negligence has been defined as the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. On the other hand, malice may be implied when a person knowing that his conduct endangers the life of another nonetheless acts deliberately with conscious disregard for life. Though these definitions bear a general similarity, they are not identical. Implied malice contemplates a subjective awareness of a higher degree of risk than does gross negligence and involves an element of wantonness which is absent in gross negligence." (Special instruction requested by defendant.)

"A finding of gross negligence is made by applying an objective test: if a reasonable person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness. However, a finding of implied malice depends upon a determination that the defendant actually appreciated the risk involved, i.e., a subjective standard." (Special instruction requested by defendant.)

"The distinction between 'conscious disregard for life' and 'conscious indifference to the consequences' is subtle but nevertheless logical. Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' The state of mind of the person who acts with conscious indifference to the consequences is simply, 'I don't care what happens.'" (Special instruction requested by the prosecution.)

the jury that it could consider defendant's degree of intoxication in deciding whether he harbored implied malice. In so holding, the Court of Appeal disagreed with the contrary holdings in *People* v. *Alvarado* (1991) 232 Cal.App.3d 501 [283 Cal.Rptr. 479] and *People* v. *Ricardi* (1990) 221 Cal.App.3d 249 [270 Cal.Rptr. 425]. We granted review to resolve this conflict.

## II

Section 22, subdivision (b), provides: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." Focusing upon the final phrase of this statute—"when a specific intent crime is charged"—the Court of Appeal held that evidence of voluntary intoxication cannot establish the absence of implied malice, because second degree murder based upon implied malice is not a specific intent crime. We conclude the Court of Appeal misinterpreted section 22.

The admissibility of evidence of voluntary intoxication to demonstrate whether a defendant charged with murder harbored malice aforethought does not depend upon whether the prosecution seeks a conviction for first or second degree murder, or attempts to prove that the defendant harbored express or implied malice. Section 22 specifies that such evidence is admissible to establish whether a defendant "harbored malice aforethought"; the statute does not distinguish between the two types of malice aforethought—express malice and implied malice—that always have been embodied in California law. As discussed below, prior to the amendment of section 22 in 1981 and 1982, it long had been established that evidence of voluntary intoxication is admissible with regard to the issue of whether a defendant harbored either express or implied malice. It is unreasonable to conclude that section 22, as amended in 1981 and 1982, presently creates such a distinction simply by including the qualifying phrase "when a specific intent crime is charged."

Prior to 1981, section 22 provided: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act." (Enacted as § 22 of 1872 Pen. Code.) At that time, it was well established that, under section 22, evidence

of voluntary intoxication was admissible with regard to the question whether the defendant acted with malice aforethought, on either an express or an implied malice theory. (See, e.g., *People* v. *Ray* (1975) 14 Cal.3d 20, 27-32, & fn. 9 [120 Cal.Rptr. 377, 533 P.2d 1017]; *People* v. *Poddar* (1974) 10 Cal.3d 750, 758 [111 Cal.Rptr. 910, 518 P.2d 342].)

In 1981, the Legislature amended section 22 as part of a broader legislative enactment whose general purpose was to abolish the doctrine of "diminished capacity." A significant provision of the 1981 statute was the enactment of section 28, stating: "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible on the issue as to whether the criminal defendant actually formed any such mental state." (Stats. 1981, ch. 404, § 4, p. 1592.) The Legislature thus prohibited the admission of evidence to negate the *capacity* of the defendant to form any mental state, but retained the existing rule that evidence was admissible with regard to whether the defendant *actually formed* a specific mental state.

Pursuant to this same legislative enactment, section 22 was divided into subdivisions and amended to read as follows: "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. Evidence of voluntary intoxication shall not be admitted *to negate the capacity* to form any mental state, including, but not limited to, purpose, intent, knowledge, or malice aforethought, with which the accused committed the act. [¶] (b) Whenever *the actual existence* of any mental state, including but not limited to, purpose, intent, knowledge, or malice aforethought, is a necessary element to constitute any particular species or degree of crime, evidence that the accused was voluntarily intoxicated at the time of the commission of the crime is admissible on the issue as to whether the defendant actually formed any such mental state." (Stats. 1981, ch. 404, § 2, p. 1592, italics added.) Thus, while the Legislature, in conformity with its abolition of the concept of *diminished capacity*, rendered evidence of voluntary intoxication inadmissible to negate the defendant's *capacity* to form any mental state, including malice aforethought, it at the same time explicitly retained the existing rule that evidence of voluntary intoxication was admissible with regard to whether a defendant *actually* harbored malice aforethought. Further, the 1981 amendment made no distinction between express and implied malice, an approach consistent with the well-established rule, recognized by this court in cases such as *People* v. *Ray, supra,* 14 Cal.3d 20, 27-32, and footnote 9, and *People* v. *Poddar, supra,* 10 Cal.3d 750, 758, that evidence of voluntary intoxication is admissible with regard to whether a defendant harbored either express or implied malice.

The broad references in subdivision (b) of section 22, as amended in 1981, to "any mental state" and to "intent" raised concerns, however, that the statute could be construed, contrary to the Legislature's intent, to alter the well-settled rule that evidence of voluntary intoxication is inadmissible to negate the existence of *general* criminal intent. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 2035 (1981-1982 Reg. Sess.) as amended May 3, 1982; *People* v. *Hood* (1969) 1 Cal.3d 444, 455-457 [82 Cal.Rptr. 618, 462 P.2d 370] [statement of general rule].) To eliminate the possibility that the 1981 amendment would be misconstrued to permit the admission of evidence of voluntary intoxication to negate *general* criminal intent, the Legislature, in 1982, promptly revised section 22, subdivision (b), to its present form, replacing the term "intent" with the phrase "a required specific intent" and adding the concluding phrase "when a specific intent crime is charged." (Stats. 1982, ch. 893, § 2, p. 3318.) The Legislature stated that this amendment was "declaratory of existing law," thus making clear that it was seeking simply to clarify the scope of the 1981 amendments. (Stats. 1982, ch. 893, § 5, p. 3318; *People* v. *Saille* (1991) 54 Cal.3d 1103, 1111, fn. 5 [2 Cal.Rptr.2d 364, 820 P.2d 588], describing as "minor" this and other contemporary amendments to a number of sections affected by the 1981 legislation.)

There is nothing to indicate that the Legislature intended its 1982 amendment to section 22 to create an unprecedented distinction between express and implied malice with regard to the admissibility of evidence of voluntary intoxication. To the contrary, an analysis by the Senate Committee on Judiciary of the proposed amendment stated, "The purpose of this bill is to make modest changes" to section 22 as amended in 1981. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 2035 (1981-1982 Reg. Sess.) as amended May 3, 1982.)[3] Further, the Legislature, expressly disclaiming any intent to create a new rule, stated that the addition of the phrase "when a specific intent crime is charged" simply was "declaratory of existing law." (Stats. 1982, ch. 893, § 5, p. 3318.) The history of section 22 thus establishes that the 1982 amendment was not intended to alter the existing rule that voluntary intoxication is admissible with regard to whether a defendant harbored malice aforethought, either express or implied.

A critical examination of the language and purpose of section 22, subdivision (b), also compels this conclusion.

As we have seen, in drafting the revision of section 22, subdivision (b), the Legislature did not state, as it easily could have done, that evidence of

---

[3]We grant defendant's unopposed request that we take judicial notice of this document. (Evid. Code, § 452, subd. (c).)

voluntary intoxication is admissible solely on the issue whether a defendant harbored express (but not implied) malice. Instead, the Legislature stated that such evidence is admissible to establish whether the defendant "harbored malice aforethought." The term "malice aforethought" includes both express and implied malice. (§ 188 ["Such malice may be express or implied."].) Thus, the language of the statute clearly appears to permit the admission of evidence of voluntary intoxication on the issue whether a defendant harbored either express or implied malice, unless a different conclusion is compelled by the concluding qualification that such evidence is admissible only "when a specific intent crime is charged."

The Attorney General proffers just such an argument, maintaining that although second degree murder is a specific intent crime when the prosecution relies upon a theory of express malice, second degree murder is not a specific intent crime when the prosecution proceeds upon a theory of implied malice. As explained below, however, it is clear that the Legislature considered murder a "specific intent crime" within the meaning of the language of section 22 whether the prosecution's theory is that malice is express or implied.

As this court recognized in *People v. Hood, supra,* 1 Cal.3d 444, 456, "[s]pecific and general intent have been notoriously difficult terms to define and apply . . . ." *Hood* addressed the question whether the defendant's voluntary intoxication could be considered in determining whether he or she committed the crime of assault. ■ Observing that "[t]he distinction between specific and general intent crimes evolved as a judicial response to the problem of the intoxicated offender" (*id.* at p. 455), this court formulated the following general rule: "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*Id.* at pp. 456-457.)

Having stated the general rule, however, the court in *Hood* concluded that this definition should not be applied mechanically and was insufficient to resolve the question before the court, because the crime of assault could equally well be characterized as either a specific or a general intent crime. (*Hood, supra,* 1 Cal.3d 444, 457-458.) The court thus concluded that "the decision whether or not to give effect to evidence of intoxication [in a prosecution for assault] must rest on other considerations." (*Id.* at p. 458.)

■ It would be equally futile to attempt to rely solely upon *Hood*'s general definition of a specific intent crime in determining, in the present

case, the effect of section 22 where the prosecution relies exclusively upon the theory that malice was implied, rather than express.

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice is express when the defendant harbored an intent unlawfully to kill. (§ 188.) It can be argued that such intent to kill does not "refer[] to defendant's intent to do some *further* act or achieve some *additional* consequence" (*Hood, supra,* 1 Cal.3d at p. 457, italics added) beyond the act proscribed by the murder statute, i.e., the killing of a human being, yet we recently reaffirmed that murder is a specific intent crime and that, pursuant to section 22, "voluntary intoxication . . . may be considered in deciding whether there was malice as defined in section 188." (*People* v. *Saille, supra,* 54 Cal.3d 1103, 1116-1117.) The decision in *People* v. *Saille* arose from a conviction of first degree murder in which malice was express. But there is no reason to reach a different conclusion when, as in the present case, malice is implied.

Malice is implied " 'when a person does an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. . . . [Citations.]' " (*People* v. *Nieto Benitez* (1992) 4 Cal.4th 91, 104 [13 Cal.Rptr.2d 864, 840 P.2d 969].) Although it can be argued that implied malice does not constitute a specific intent as described in *Hood* because it does not involve an "intent to do some further act or achieve some additional consequence," it is quite clear that implied malice does not fit *Hood's* description of general intent, which is "an intent merely to do a violent act." (*Hood, supra,* 1 Cal.3d at pp. 457, 458.) Although implied malice may not fall literally within the *Hood* formulation of specific intent, the element of implied malice that requires that the defendant act with knowledge of the danger to, and in conscious disregard of, human life, is closely akin to *Hood's* definition of specific intent, which requires proof that the defendant acted with a specific and particularly culpable mental state. Thus, read in context, the phrase "when a specific intent crime is charged" in section 22 includes murder, even where the prosecution relies exclusively upon the theory that malice is implied, rather than express.[4]

Furthermore, as will be demonstrated, this interpretation of the statutory language is confirmed by an examination of the purpose of section

---

[4]Justice Mosk's concurring and dissenting opinion states that in *People* v. *Visciotti* (1992) 2 Cal.4th 1, 58 [5 Cal.Rptr.2d 495, 825 P.2d 388], *People* v. *Coleman* (1989) 48 Cal.3d 112, 138 [255 Cal.Rptr. 813, 768 P.2d 32], and *People* v. *Lee* (1987) 43 Cal.3d 666, 670 [238 Cal.Rptr. 406, 738 P.2d 752] this court held "that specific intent and implied malice are mutually exclusive." (Conc. and dis. opn. of Mosk, J., *post,* p. 464.) Those cases do not so hold, instead observing that the crime of *attempted* murder requires a specific intent *to kill,* and concluding that, in the context of an attempted murder, " '[i]mplied malice . . . cannot

22, subdivision (b), which specifies when evidence of voluntary intoxication is admissible with regard to the question whether a defendant formed a required mental state. (*People* v. *Saille, supra,* 54 Cal.3d 1103, 1116.)

Among the different approaches to this issue adopted in various jurisdictions (1 Robinson, Criminal Law Defenses (1984) § 65, pp. 288-294 [Robinson]), section 22 exemplifies "the common law approach of permitting voluntary intoxication as a defense to 'specific intent offenses' and barring it as a defense to 'general intent offenses.'" (Robinson, *supra,* § 65, at pp. 291-292, fn. omitted.) This distinction between specific and general intent crimes "is a device to 'permit evidence of intoxication to reduce the crime to a lower degree, but not to admit evidence of self-induced intoxication if it would result in total acquittal.'" (*Id.* at p. 298, fn. omitted, quoting Fletcher, Rethinking Criminal Law (1978) p. 848 [Fletcher].)[5]

Allowing a defendant charged with murder to introduce evidence of voluntary intoxication to demonstrate the absence of either express or implied malice would not result in an acquittal, but in reduction of the offense to involuntary or vehicular manslaughter, which involve the unlawful killing of a human being without malice. (§ 192; see *People* v. *Saille, supra,* 54 Cal.3d 1103, 1114.) Thus, we conclude that section 22 was not intended, in murder prosecutions, to preclude consideration of evidence of voluntary intoxication on the issue whether a defendant harbored malice aforethought, whether the prosecution proceeds on a theory that malice was express or implied.

The circumstances of the present case demonstrate the logic of this conclusion. Defendant was charged with murder and was prosecuted on the theory that malice could be implied because, in light of defendant's experiences stemming from his prior convictions for driving under the influence and his resulting knowledge of the danger to others posed by such conduct,

---

coexist with a specific intent *to kill.*'" (*People* v. *Visciotti, supra,* 2 Cal.4th 1, 58, italics added.) Nothing in those cases suggests that evidence of voluntary intoxication is inadmissible in a murder case in which the prosecution proceeds on an implied malice theory.

[5]Fletcher aptly observes: "This distinction [between specific and general intent] glides well through the sea of crimes defined by the pattern 'assault with intent to. . . .' Yet the distinction scrapes bottom as soon as we consider more compactly defined offenses, such as murder and larceny. Though malice does not represent an unrealized goal that goes beyond the act of killing, the courts treat it as a form of specific rather than general intent. [Fn. omitted.] This view facilitates a compromise between the rigors of denying the relevance of intoxication and allowing it to undercut all liability; in this respect, the classification is functionally sound." (Fletcher, *supra,* at p. 849.)

Fletcher further notes: "The distinction between general and specific intent is frequently litigated, for the simple reason that the courts tend to employ these terms as though they had a meaning beyond their function as devices for seeking a compromise verdict." (Fletcher, *supra,* at p. 850.)

he performed an act dangerous to life and acted with conscious disregard for human life by driving while intoxicated. Defendant also was charged with the lesser offense of gross vehicular manslaughter while intoxicated, which does not require that the defendant harbor malice.[6]

It was undisputed that defendant drove a vehicle while having a blood-alcohol level at least three times the legal limit, that the natural consequences of this act were dangerous to human life, and that this act resulted in the death of a human being. The sole disputed issue was whether defendant knew that his conduct endangered the life of another and acted with conscious disregard for human life. If so, malice would be implied and defendant would be guilty of second degree murder. If not, defendant would be guilty of gross vehicular manslaughter while intoxicated. The most important factor bearing upon defendant's awareness of the dangerousness of his conduct and conscious disregard of that danger was his degree of intoxication when he undertook his dangerous course of conduct. It appears obviously appropriate to permit the jury to consider defendant's degree of intoxication in determining whether he formed the mental state that distinguishes the greater offense of murder from the lesser offense of manslaughter.

The Attorney General contends it is anomalous to allow a defendant who kills another while driving under the influence to rely upon the fact of self-induced intoxication to demonstrate that he or she did not harbor malice and, therefore, is guilty only of manslaughter rather than murder. But a defendant who kills another by firing a gun may defend against a charge of murder by establishing that, due to voluntary intoxication, he or she did not harbor malice and is guilty instead of manslaughter. (*People* v. *Saille, supra*, 54 Cal.3d 1103, 1116-1117.) The laws governing prosecutions for murder must apply equally whether the defendant kills the victim by means of a firearm or an automobile.

Consider, for example, a hypothetical situation in which a defendant, with no prior history of driving under the influence, consumes alcohol at a social gathering after having arranged to be driven home by his or her spouse. The defendant's spouse unexpectedly becomes ill and the defendant, who is

---

[6]Penal Code section 191.5, subdivision (a), defines gross vehicular manslaughter while intoxicated as "the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of Section 23152 or 23153 of the Vehicle Code, and the killing was either the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence, or the proximate result of the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence." (See *People* v. *Ochoa* (1993) 6 Cal.4th 1199 [26 Cal.Rptr.2d 23, 864 P.2d 103].)

intoxicated, decides to drive, and causes a fatal accident. Under such circumstances, it would not be anomalous to permit the defendant to defend against a charge of murder on the ground that, due to voluntary intoxication, he or she did not appreciate the dangerousness of his or her conduct, hence did not harbor malice, and should be convicted of the lesser offense of manslaughter.

For the same reason, it was proper for defendant in the present case to attempt to establish that, due to voluntary intoxication, he did not harbor malice, but the jury, as it was entitled to do, rejected this proffered defense, impliedly finding that defendant acted with knowledge, and conscious disregard, of the danger to human life in undertaking to drive while intoxicated.

It is beyond dispute that drinking drivers exact an enormous toll on society. (*Michigan State Police Dept.* v. *Sitz* (1990) 496 U.S. 444, 451 [110 L.Ed.2d 412, 420-421, 110 S.Ct. 2481]; *Ingersoll* v. *Palmer* (1987) 43 Cal.3d 1321, 1338-1339 [241 Cal.Rptr. 42, 743 P.2d 1299].) When a defendant drives while under the influence and thereby causes the death of another, serious punishment is warranted, but such serious punishment may be imposed without altering the long-settled requirement that a defendant not be convicted of murder unless he or she actually harbored malice. The Legislature specifically has addressed the situation in which a defendant drives under the influence and thereby causes the death of another, but does not harbor malice, by enacting section 191.5, which provides a maximum sentence of 10 years in prison for gross vehicular manslaughter while intoxicated.

■   If, in a case like the present one, voluntary intoxication actually prevented a defendant from forming implied malice, he or she is guilty of gross vehicular manslaughter rather than murder. (See *People* v. *Watson* (1981) 30 Cal.3d 290, 296 [179 Cal.Rptr. 43, 637 P.2d 279].) Prohibiting the trier of fact from considering evidence of voluntary intoxication in determining whether a defendant harbored implied malice would blur this distinction between second degree murder with implied malice and gross vehicular manslaughter while intoxicated. As we observed in *People* v. *Watson, supra,* in distinguishing vehicular manslaughter (§ 192, subd. (c)) from second degree murder: "A finding of gross negligence [required for the offense of vehicular manslaughter] is made by applying an *objective* test: if a *reasonable person* in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness. [Citation.] However, a finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard. [Citation.]" (*People* v. *Watson, supra,* 30 Cal.3d 290, 296-297, italics in original.)

■ As the present case demonstrates, allowing the trier of fact to consider the effect of the defendant's intoxication will not preclude murder convictions when warranted. The jury in the present case considered the effect of defendant's intoxication but concluded nonetheless that he acted with implied malice. The result in the present case belies the concurring and dissenting opinion's lament that, under our holding, "drunk drivers could almost never be prosecuted for murder no matter how wanton their acts." (Conc. and dis. opn. of Mosk, J., *post*, p. 465.)

## III

■ Having concluded that the trial court did not err in instructing the jury to consider defendant's degree of intoxication in determining whether he harbored malice, we turn to defendant's contention that the trial court erred in refusing his request that the jury be instructed, in accordance with CALJIC No. 8.47, that if "defendant, while unconscious as a result of voluntary intoxication, killed another human being without intent to kill and without malice aforethought, the crime is involuntary manslaughter." Although this instruction is a correct statement of law in the abstract, the trial court properly refused the instruction because, in the context of the present case, it erroneously implied that, if defendant was unconscious when the collision occurred, he could not be convicted of murder.

The circumstance that a defendant, when a fatal traffic collision occurs, is unconscious as a result of voluntary intoxication, does not preclude a finding that the defendant harbored malice, because malice may have been formed prior to that time. In *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890 [157 Cal.Rptr. 693, 598 P.2d 854], this court considered whether an intoxicated driver harbored malice sufficient to support an award of punitive damages in a personal injury action.[7] The complaint alleged that the defendant was an alcoholic with a history of convictions for driving under the influence, who previously had caused a serious automobile accident while driving under the influence of alcohol. Despite his alcoholism, defendant had accepted employment delivering alcoholic beverages. When the accident occurred, the defendant was engaged in his employment and was consuming alcoholic beverages while driving. ■ In holding that these allegations, if proved, were sufficient to demonstrate the malice required for an award of punitive damages, this court focused upon the defendant's decision to *begin* drinking, rather than his mental state when the collision occurred: "[O]ne who voluntarily commences, and thereafter continues, to consume alcoholic beverages

---

[7]Punitive damages may be awarded only upon proof "that the defendant has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) "[A] conscious disregard of the safety of others may constitute malice within the meaning of section 3294 of the Civil Code." (*Taylor* v. *Superior Court, supra*, 24 Cal.3d 890, 895.)

to the point of intoxication, knowing from the outset that he must thereafter operate a motor vehicle demonstrates, in the words of Dean Prosser, 'such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton.' [Citation.]" (*Id.* at p. 899.)

Similarly, in *People* v. *Watson, supra,* 30 Cal.3d 290, this court held there was probable cause to charge a defendant with murder, based upon evidence that he consumed alcoholic beverages at a bar, raising his blood-alcohol level to .23 percent, drove through a red traffic light, narrowly avoiding a collision, then accelerated to more than 80 miles per hour and collided with a vehicle at another intersection, killing 2 persons. Relying upon the above quoted holding in *Taylor* that one who drinks to the point of intoxication, knowing he or she thereafter must drive, exhibits a conscious disregard of the safety of others, this court observed: "Defendant had consumed enough alcohol to raise his blood alcohol content to a level which would support a finding that he was legally intoxicated. He had driven his car to the establishment where he had been drinking, and he must have known that he would have to drive it later. It also may be presumed that defendant was aware of the hazards of driving while intoxicated." (*Id.* at p. 300.) After describing the defendant's extremely dangerous driving, this court held: "In combination, these facts reasonably and readily support a conclusion that defendant acted wantonly and with a conscious disregard for human life." (*Id.* at p. 301.)

As this court recognized in *Taylor* (*supra,* 24 Cal.3d 890) and *Watson* (*supra,* 30 Cal.3d 290), the determination whether a defendant who drives under the influence of alcohol exhibits a conscious disregard of human life does not depend exclusively upon the defendant's state of mind at the time the accident occurs. "A high level of intoxication sets the stage for tragedy long before the driver turns the ignition key." (*People* v. *Bennett* (1991) 54 Cal.3d 1032, 1038 [2 Cal.Rptr.2d 8, 819 P.2d 849].) ▮ In the present case, for example, it can be inferred from the presence of empty malt liquor cans in his vehicle that defendant continued to drink while he was driving. Under such circumstances, and in light of defendant's past exposure to the extreme danger posed by driving under the influence of alcohol or drugs, the jury reasonably could conclude that defendant, in undertaking this course of conduct, acted with knowledge of the dangerousness of his conduct and with conscious disregard of that danger. Because defendant knowingly embarked upon such an extremely dangerous course of conduct with conscious disregard of the danger, his malice aforethought would not be negated simply by reason of his having succeeded in rendering himself unconscious prior to the fatal collision. Accordingly, the trial court did not err in refusing defendant's proffered instruction regarding unconsciousness caused by voluntary intoxication.

Moreover, even if the trial court had erred in this regard, reversal of the resulting conviction would not be required. The jury adequately was instructed that it could consider defendant's degree of intoxication in determining whether he acted with malice. By finding defendant guilty of second degree murder, rather than gross vehicular manslaughter while intoxicated, the jury necessarily concluded that, despite his intoxication, defendant actually appreciated the risk posed by his conduct and acted with conscious disregard of life. It is clear, therefore, that instructing the jury pursuant to CALJIC No. 8.47 would not have affected its verdict.

### DISPOSITION

The judgment of the Court of Appeal is affirmed.

Kennard, J., Arabian, J., and Panelli, J.,* concurred.

**MOSK, J.,** Concurring and Dissenting.—Defendant, driving while intoxicated, killed another and was convicted of second degree murder. We granted review to consider his claim that he was entitled to an instruction based on a defense of unconsciousness brought about by his voluntary intoxication, and ultimately to determine whether evidence of such intoxication is material to negate the subjective component of implied-malice murder: a conscious and antisocial disregard for human life.

The majority conclude that all murders, even those committed with implied malice aforethought, are specific intent offenses. That is clearly incorrect.

The majority, with considerable circumlocution, properly hold that an intoxicated defendant need not be shown to have had express malice; implied malice is adequate. But then, with remarkable inconsistency, they require the prosecution to prove the defendant had not a general but a specific intent.

If a drunken driver is physically and mentally unable to develop *express* malice, how can he possibly have the cognitive ability to conceive a specific intent? Although this defendant does not appear to benefit from the majority opinion, its inconsistency gives a green light to all future vehicular murder defendants to demand that the prosecution establish they had a demonstrable specific intent. As contended by the Attorney General, the foregoing virtually impossible requirement constructs a serious and unnecessary roadblock

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

to prosecutors who seek to enforce the Legislature's command to severely punish intoxicated drivers who kill innocent victims.

The majority's legal analysis thus is flawed. It cannot be squared with the legislative intent in enacting statutes regarding murder and voluntary intoxication or with the common law antecedents to those statutes. The effect of today's decision will be to allow the grossly intoxicated killer an unanticipated defense to murder based on unconsciousness. I doubt the Legislature ever intended such a result.

In an information, the district attorney charged defendant with four crimes stemming from a fatal traffic accident.

The information recited the following charges: in count I, murder (Pen. Code, § 187; unlabeled statutory references are to this code); in count II, driving under the influence of an intoxicant (Veh. Code, § 23152, subd. (a)) with three convictions therefor in the past seven years (see *id.*, § 23175, subd. (a)); in count III, driving with a blood-alcohol level of 0.08 percent or more by weight (*id.*, § 23152, subd. (b)) with three convictions therefor in the past seven years (see *id.*, § 23175, subd. (a)); and in count IV, driving with a license that defendant knew to have been suspended or revoked for an intoxication-related driving offense (*id.*, § 14601.2, subd. (a)).

A jury tried defendant. The jury heard evidence that defendant was driving drunk down Van Buren Boulevard, a four-lane high-speed thoroughfare at the accident site, early on the afternoon of Saturday, November 17, 1990. There was considerable traffic, and defendant's erratic driving caused a backup. His car crossed into an oncoming lane and collided with another car, killing an occupant. Witnesses who approached defendant's car shortly after the accident noticed a strong odor of alcohol wafting from it. Defendant was sprawled across the front seat, and open cans of malt liquor were scattered on the car floor.

It was not disputed that defendant was drunk at the time of the accident. A blood sample was drawn from defendant within two hours after the accident. The sample showed a blood-alcohol concentration of 0.24 grams of alcohol per deciliter of blood. There was evidence, based on alcohol's dissipation rate, that defendant's blood-alcohol level was 0.27 grams per deciliter shortly after the accident.

The prosecution introduced evidence of defendant's subjective awareness of events and of the risk of driving drunk.

There was evidence that after the accident defendant stated, "Take me straight to the gas chamber—[I have] killed somebody." There was also

evidence that defendant was convicted of driving under the influence of alcohol in 1987, 1989, and 1990. After the 1989 conviction, defendant enrolled in a second-offender program and attended several sessions, during one of which a film was shown that discussed the carnage wrought by drunk driving. Defendant was dismissed from the program for failing to attend Alcoholics Anonymous meetings and other lapses. And he was driving with a suspended license at the time of the accident. From his hospital bed after the accident, he told a detective he had a drinking problem that had become progressively worse for 18 months.

The defense was unconsciousness. Defendant provided the expert testimony of Dr. Craig Rath, a psychologist, that a majority of people with a blood-alcohol concentration of 0.25 percent—i.e., 0.25 grams of alcohol per deciliter of blood (see Veh. Code, § 23155, subd. (b))—or greater will be in a stupor. Defendant offered evidence that he was indeed in a stupor at the time of the accident. When paramedics arrived, defendant was unconscious and was unresponsive to verbal and pain stimuli. Two to three minutes later, he regained consciousness, but he did not appear to understand questions, and his speech was incoherent. Defendant later told the detective that he could not remember driving. A witness testified that defendant's head was nodding shortly before the collision as if he was fighting off sleep.

Although the charging papers alleged murder without further specification, the case went to the jury solely on a theory of implied malice. The jury found defendant guilty of second degree murder and also found true the allegations of three prior convictions for driving under the influence of alcohol.

The Court of Appeal stayed the sentences for counts II and IV under section 654 but otherwise affirmed the judgment. In substance it rejected the implicit view of *People* v. *Alvarado* (1991) 232 Cal.App.3d 501, 504, 506 [283 Cal.Rptr. 479], and *People* v. *Ricardi* (1990) 221 Cal.App.3d 249, 256 [270 Cal.Rptr. 425], that evidence of voluntary intoxication is relevant to negate the subjective component of implied-malice murder, relying instead on the contrary implicit view of *People* v. *Cleaves* (1991) 229 Cal.App.3d 367, 380-381 [280 Cal.Rptr. 146].

As stated, defendant contends that he was entitled to an instruction based on a defense of unconsciousness brought about by voluntary intoxication. He maintains that instructional errors allowed the jury to convict him of second degree murder even if his drunkenness made it impossible to appreciate the risk to others at the time of the accident.

For reasons to be set forth, I do not agree.

In this state, "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) "Such malice [aforethought] may be express or implied." (§ 188.) Murder with implied malice aforethought is found when a person kills another and, inter alia, "the circumstances attending the killing show an abandoned and malignant heart." (*Ibid.*)

We have concluded that the statutory "abandoned and malignant heart" definition contains two components: a subjective conscious and antisocial disregard for human life, and an objectively dangerous physical act. As we have explained, implied-malice murder occurs when a person commits "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life . . . . [Citations.] Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*People* v. *Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279], internal quotation marks omitted [*Watson*]; *People* v. *Nieto Benitez* (1992) 4 Cal.4th 91, 104 [13 Cal.Rptr.2d 864, 840 P.2d 969].)

As stated, the ultimate question in this case is whether evidence of voluntary intoxication is relevant to negate implied malice aforethought, specifically its subjective component of conscious and antisocial disregard for human life.

Section 22 yields part of the answer. That statute provides: "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. . . . [¶] (b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

Prefatorily, I note that the charging papers in this case did not specify the type of murder of which defendant was accused. Until it is clear that a defendant faces liability only for implied-malice murder, he or she is entitled under section 22 to introduce evidence of voluntary intoxication, because some types of murder charges—those involving express malice—are charges of specific intent crimes, and there is a risk that the defendant could be convicted of express-malice murder without having the opportunity to negate the element of intent although the crime was in fact committed.

This case is premised on claims of instructional error. A court does not err by failing to instruct on the basis of wholly immaterial evidence. (See *People*

v. *Jerman* (1946) 29 Cal.2d 189, 196-197 [173 P.2d 805] [prejudice analysis].) Indeed the court's duty is not to instruct on the basis of such evidence. To do so would be to allow the jury to consider issues extraneous to its task. (*People* v. *Roe* (1922) 189 Cal. 548, 558-559 [209 P. 560].) The question this court faces, then, is whether at the time defendant sought an instruction based on unconsciousness, there was material evidence before the jury that properly raised that issue. If not, defendant was not entitled to an instruction.

The prosecution's theory that defendant was not guilty of express-malice murder, but at most of murder with implied malice, became clear at closing argument, at which time the prosecutor perceptively told the jury, "Remember, *he didn't have the intent to kill.* There's no question that *he had no intent to kill.* And you'll receive an instruction explaining that to you." He then quoted the instruction and stated, "Consequently, you are being told by the law don't try [to] figure that the traffic collision—that the traffic violation that caused this death was the intentional act, because *it's never going to be intentional in these types of murders.* Never will be." (Italics added.) Although the argument itself does not carry any legal authority (see *People* v. *Clair* (1992) 2 Cal.4th 629, 663, fn. 8 [7 Cal.Rptr.2d 564, 828 P.2d 705]), it, combined with the instructions viewed as a whole, allows me to fairly conclude the murder case proceeded to the jury only on the basis of implied malice and general intent.

With this posture of the case in mind, I turn to defendant's claims of error.

Defendant first contends that sections 22, 187 and 188 permit him to introduce evidence of his voluntary drunkenness to counter a charge of implied-malice murder, whether or not implied-malice murder is a specific intent crime. Citing the well-established principle that a construction making some words redundant is to be avoided (e.g., *People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1010 [239 Cal.Rptr. 656, 741 P.2d 154]), defendant argues that section 22 must permit him to introduce evidence of voluntary intoxication to negate the mental state required for implied-malice murder because "If section 22 applied only to express malice murder, there would have been no reason for the drafters to include 'malice aforethought' as an enumerated mental state because express malice is identical to a specific intent to unlawfully kill."

I cannot agree. Defendant's interpretation would make wholly ineffectual the provision that "[e]vidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 22, subd. (b).) The primary goal

of all statutory interpretation is to ascertain and give effect to the lawmakers' intent. (*Pacific Southwest Realty Co.* v. *County of Los Angeles* (1991) 1 Cal.4th 155, 167 [2 Cal.Rptr.2d 536, 820 P.2d 1046].) To determine that intent, I first look to the statutory words themselves. (*People* v. *Woodhead, supra,* 43 Cal.3d at p. 1007.)

To adopt defendant's interpretation of section 22 would be to render a nullity the substantial "when a specific intent crime is charged" clause, which qualifies the previous term "malice aforethought." The language of section 22 is *not* ambiguous and cannot be construed to benefit defendant by reason of ambiguity (cf. *People* v. *Belmontes* (1983) 34 Cal.3d 335, 345 [193 Cal.Rptr. 882, 667 P.2d 686])—the comma immediately before the clause "when a specific intent crime is charged" unambiguously qualifies the term "malice aforethought" that precede it, limiting it to express malice. (*Jimenez* v. *Workers' Comp. Appeals Bd.* (1991) 1 Cal.App.4th 61, 66-67 [1 Cal.Rptr.2d 660]; *Ingram* v. *Carruthers* (1952) 194 Tenn. 290 [250 S.W.2d 537, 538-539].)

Should there be any lingering doubt that the Legislature did not intend to allow voluntary intoxication to negate the mental element of all murders, temporal considerations ought to dispel it. If ever the Legislature intended to lighten the criminal culpability of those who committed implied-malice murder while intoxicated, 1981 and 1982, when the Legislature amended section 22, was not the time. "The laws passed in 1981 made California's drunk-driving laws among the toughest in the nation. They called for mandatory jail sentences for repeat offenders and increased fines, restricted plea bargaining and provided for treatment programs, jail sentences or restricted driving privileges for first-time offenders. [¶] After the laws went into effect in 1982, there was a dramatic drop in the number of deaths caused by drunk drivers—from 1,965 in 1981 to 1,705 in 1982. There was a further decline in 1983. . . ." (*Legislature Oks Stiffer Drunk Driver Penalties; Lawmakers Admit Failure of Earlier Punitive Measures to Keep Problem Drinkers Out of Cars,* L.A. Times (home ed., Aug. 29, 1986) pt. 1, p. 1, col. 2.)

The 1981 and 1982 amendments to sections 22 and 188 were enacted to ensure that diminished capacity could not be used as a defense to crime (*People* v. *Saille* (1991) 54 Cal.3d 1103, 1111 [2 Cal.Rptr.2d 364, 820 P.2d 588]; see also *People* v. *Mayfield* (1993) 5 Cal.4th 142, 198, fn. 10 [19 Cal.Rptr.2d 836, 852 P.2d 331]) and to replace that defense with so-called diminished actuality "when [and only when] a specific intent crime is charged" (§ 22). Given public attitudes toward intoxication-related crime at the time section 22 was amended, I believe it highly unlikely that the

Legislature intended to allow evidence of voluntary intoxication to negate an element of murder with implied malice aforethought. The original version of section 22 entirely barred a defendant from introducing voluntary intoxication evidence to defend against a second degree murder charge (see *post*, pp. 468-469), and I doubt the Legislature intended to liberalize the statute to the extent of creating a defense of voluntary intoxication to homicides committed without specific intent.[1]

Next, defendant asserts that second degree murder committed with implied malice aforethought is indeed a specific intent crime under section 22. Inexplicably, the majority agree with him. I do not.

The majority's conclusion that all murders, without exception, are specific intent offenses is arguably compelled if the plain language of section 22 that forbids the introduction of evidence of voluntary drunkenness "when a specific intent crime is charged" is to control.[2]

However, it is beyond question that implied-malice murder is not a specific intent crime. Although certain appellate decisions have stated otherwise (*People* v. *Alvarado, supra*, 232 Cal.App.3d 501, *People* v. *Ricardi, supra*, 221 Cal.App.3d 249, and *People* v. *Ricardi* (1992) 9 Cal.App.4th 1427 [12 Cal.Rptr.2d 364]), they are incorrect, as are the majority. Indeed, if a single high court in the common law world besides this new majority has

---

[1]As mentioned in the text, *ante*, sections 22 and 188 were modified in 1981 and 1982. (Stats. 1981, ch. 404, §§ 2, 6, pp. 1591-1593; Stats. 1982, ch. 893, §§ 2, 4, pp. 3317-3318.) The 1982 legislation declared that the amendments to sections 22 and 188 "are declaratory of existing law" (Stats. 1982, ch. 893, § 5, p. 3318). Defendant interprets the Legislature's 1982 declaration to mean that section 22 applies to permit evidence of voluntary intoxication to negate "the actual existence of any mental state, including . . . malice aforethought, . . . necessary . . . to constitute any particular species or degree of crime. . . ," for that language appeared in the 1981 version of section 22, subdivision (b), and hence was the "existing law."

The 1981 version of section 22 indeed did permit the introduction of evidence of voluntary intoxication to negate malice aforethought when that mental state was a necessary element of a species or degree of crime. The Legislature evidently realized it had erred by allowing the use of such evidence so expansively, and tried to restore the status quo before 1981 by adding its declaration regarding existing law—which means the statutory law prior to 1981. Defendant's own production of the legislative history supports this view. (See Sen. Com. on Judiciary, Analysis of Sen. Bill No. 2035 (1981-1982 Reg. Sess.) as amended May 3, 1982.)

Of course, the plain language adopted in the 1981 version of section 22 contravened the Legislature's declaration that the 1982 language restated existing law. The Legislature could not undo its mistake by a later declaration. By the same token, however, the 1982 declaration cannot change the plain meaning of section 22's current form and reactivate the 1981 version thereof. Defendant's contention must therefore be rejected.

[2]Section 22 refers to the charging of a specific intent crime. What is usually charged in murder cases is "murder" under section 187 without amplification. However, because murder includes homicide with implied and express malice (§§ 187, 188), a specific intent crime is not necessarily involved when murder is charged.

ever held that implied-malice murder, as defined under a statute similar to California's, is a specific intent offense, it has not been called to our attention. To so conclude is to turn away from a long legal tradition.

"General intent" and "specific intent" are shorthand devices best and most precisely invoked to contrast offenses that, as a matter of policy, may be punished despite the actor's voluntary intoxication (general intent) with offenses that, also as a matter of policy, may not be punished in light of such intoxication if it negates the offense's mental element (specific intent). (*People* v. *Hood* (1969) 1 Cal.3d 444, 455-458 [82 Cal.Rptr. 618, 462 P.2d 370].) Evidence of voluntary intoxication may be introduced to negate an element of offenses requiring relatively complex cogitation—a mental function integral to many crimes that contain a "definition [that] refers to defendant's intent to do some further act or achieve some additional consequence . . ." (see *id.* at p. 457)—because alcohol can interfere with such intent (*id.* at p. 458).

In *People* v. *Rocha* (1971) 3 Cal.3d 893 [92 Cal.Rptr. 172, 479 P.2d 372], we rejected a contention that assault with a deadly weapon is a specific intent crime. (*Id.* at p. 897.) We explained that assault is not a specific intent crime because voluntary intoxication so naturally lends itself to its commission. "Since alcohol is so often a factor inducing simple assaults . . . it would be anom[a]lous to permit exculpation because of intoxication." (*Id.* at p. 898.) The same is true of implied-malice murder: alcohol intoxication naturally lends itself to the crime's commission because it impairs the sound judgment or lowers the inhibitions that might stop a sober individual from committing a highly dangerous act leading to another's death. Hence implied-malice murder cannot be a specific intent offense.

The majority rely on the statement in *People* v. *Hood, supra,* 1 Cal.3d 444, 456-457, that "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent."

But the quoted material is only a guideline for determining on which side of the policy-based divide separating general from specific intent offenses a particular crime lies. The key is whether policy considerations permit the introduction of voluntary intoxication evidence to negate an element of the crime. The majority thus interpret *People* v. *Hood, supra,* 1 Cal.3d 444,

backwards, relegating that case's key discussion of voluntary intoxication to a mention of " 'other considerations' " without elaboration.

Moreover, even under the subsidiary guideline on which the majority rely, implied-malice murder cannot be said to be a specific intent offense. Implied-malice murder does not contain the element of intent to do a further act or achieve a future consequence. There is no goal-oriented behavior, unlike in an express-malice killing. Implied-malice murder requires only that the defendant intentionally do "an act with a high probability that it will result in death and do[] it with a base antisocial motive and with a wanton disregard for human life." (*Watson, supra,* 30 Cal.3d at p. 300.) In other words, the only intent required is to recklessly do an act "the natural consequences of which are dangerous to [human] life" (*ibid.,* internal quotation marks omitted)—an act "likely to kill" (*People* v. *Washington* (1965) 62 Cal.2d 777, 780 [44 Cal.Rptr. 442, 402 P.2d 130]; see also *Pizano* v. *Superior Court* (1978) 21 Cal.3d 128, 135 [145 Cal.Rptr. 524, 577 P.2d 659]).

Stated more generally, "[i]mplied malice is malice inferred in law from the defendant's conduct rather than by proof of an actual intention to kill. The mens rea encompassed by implied malice has no application in a prosecution in which a specific intent to kill is a required element of the accused offense. An instruction on implied malice in relation to the crime of attempted murder is misleading to a jury." (*Keys* v. *State* (1988) 104 Nev. 736 [766 P.2d 270, 272] [discussing a Nevada statute similar to California law in language and prior interpretation].) Thus we have held quite recently that specific intent and implied malice are mutually exclusive. "It is well settled that both the former crime of assault with intent to commit murder . . . and the crime of attempted murder require a specific intent to kill and cannot be based on mere implied malice even though implied malice would sustain a charge of murder itself." (*People* v. *Coleman* (1989) 48 Cal.3d 112, 138 [255 Cal.Rptr. 813, 768 P.2d 32].) So " 'where a specific intent to kill is absolutely required, reliance upon any definition of murder based upon implied malice is logically impossible, for implied malice cannot coexist with express malice. With this fundamental concept to be reckoned with, instructions on the crime of attempt to commit murder, necessarily, when they define the underlying crime of murder, must be limited only to that kind of murder where a *specific* intent to kill or, in other words, *express* malice, is one of the elements.' " (*People* v. *Lee* (1987) 43 Cal.3d 666, 670-671 [238 Cal.Rptr. 406, 738 P.2d 752]; see also *People* v. *Visciotti* (1992) 2 Cal.4th 1, 58-59 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

If implied-malice murder were a specific intent crime, the jury would have to find the defendant carried out goal-oriented behavior, meaning that the

defendant had the further precise purpose to kill when performing the lethal act. (See *People* v. *Hood, supra,* 1 Cal.3d at p. 457.) In that case drunk drivers could almost never be prosecuted for murder no matter how wanton their acts, for an avowed purpose to kill is virtually never present in drunk-driving homicides. The Legislature cannot have intended to grant drunk drivers such a windfall at the same time it was increasing the penalties for drunk driving.

It should be plain that implied-malice murder cannot be a specific intent offense and that the Legislature never intended for it to be. And yet, as stated, the majority's position that implied-malice murder is a specific intent offense is required to reach their result, else section 22 is stretched beyond recognition.

Next, defendant contends—and probably inspired the majority—that even if implied-malice murder is not a classic specific intent crime, the mental state required for the offense is closer to that of a specific intent crime than to that of a general intent crime.

I disagree. To be sure, implied-malice murder requires a defendant's knowledge of the risk to life and a conscious disregard thereof. But the presence of the knowledge element in the definition of implied-malice murder does not consign that offense to the rubric of specific intent crimes.

"First degree murder and second degree murder premised on express malice involve the specific intent to kill, whereas second degree murder premised on implied malice involves a general intent to do the act and the mental state of knowledge and conscious disregard for the risk to human life." (*People* v. *Cleaves, supra,* 229 Cal.App.3d 367, 380.) Therefore, "second degree murder based on implied malice is a general intent crime but with the requirement of a certain mental state." (*Id.* at p. 381.) As we explained in *People* v. *Daniels* (1975) 14 Cal.3d 857 [122 Cal.Rptr. 872, 537 P.2d 1232], the sale of a restricted dangerous drug under Health and Safety Code, former section 11912 was a general intent crime (14 Cal.3d at p. 861) even though "[t]he statutory definition of the offense focuses on the act of the sale itself to which the courts have added the element of knowledge of the character of the substance sold. . . . [¶] It is apparent that the offense defined in former section 11912 does not expressly require an intent 'to do a further act or achieve a future consequence' (*People* v. *Hood, supra,* 1 Cal.3d at p. 457)." (14 Cal.3d at p. 860; see also *People* v. *Glover* (1991) 233 Cal.App.3d 1476, 1479, 1483-1484 [285 Cal.Rptr. 362] [arson as proscribed in section 451 is not a specific intent crime even though it contains the mental element of willfulness and maliciousness]; *People* v. *Calban* (1976) 65 Cal.App.3d 578, 583-584 [135 Cal.Rptr. 441].)

Next, defendant strongly implies and amici curiae directly state that if voluntary intoxication cannot be used to negate the subjective component of implied-malice murder, the line between gross vehicular manslaughter while intoxicated (§ 191.5) and implied-malice murder would be blurred, and the practical effect would be the abolition of any distinction between murder and such manslaughter when alcohol is involved.

That is incorrect. A conviction for implied-malice murder requires proof of implied malice aforethought, which in turn requires proof that the defendant had a conscious and antisocial disregard for human life. By contrast, gross vehicular manslaughter while intoxicated requires proof only of gross negligence under an objective test. (§ 191.5, subd. (a); see *People* v. *Ochoa* (1993) 6 Cal.4th 1199, 1204 [26 Cal.Rptr.2d 23, 864 P.2d 103]; *People* v. *Bennett* (1991) 54 Cal.3d 1032, 1036 [2 Cal.Rptr.2d 8, 819 P.2d 849].) "Though these [mental states] bear a general similarity, they are not identical. Implied malice contemplates a subjective awareness of a higher degree of risk than does gross negligence, and involves an element of wantonness . . . absent in gross negligence." (*Watson, supra,* 30 Cal.3d at p. 296.) A person does not become liable for implied-malice murder simply by being drunk and killing someone: the offense must satisfy the physical act and mental state components of implied-malice murder. The physical act must be of a type that is "likely to kill" (*People* v. *Washington, supra,* 62 Cal.2d 777, 780); its "natural consequences" must be "dangerous to [human] life"; it must carry a "high probability that it will result in death . . ." (*Watson, supra,* 30 Cal.3d at p. 300). This is a heavy burden. And the mental component of implied malice requires a showing that a defendant was subjectively aware of a life-threatening risk but chose to disregard it. (*Ibid.*) This component is ordinarily proven by illustrating the circumstances leading to the ultimately lethal result, including but not limited to the defendant's history of alcohol use and abuse and attendant awareness of the possible consequences of that fateful decision. "The very nature of implied malice . . . invites consideration of [all] the circumstances preceding the fatal act." (*People* v. *Nieto Benitez, supra,* 4 Cal.4th at p. 107; accord, *Watson, supra,* 30 Cal.3d at pp. 300-301.) In *Watson,* we held that a congeries of facts "support[s] a conclusion that defendant acted wantonly and with a conscious disregard for human life." (30 Cal.3d at p. 301.) Our totality-of-the-circumstances analysis was codified by the Legislature in sections 191.5, subdivision (d), and 192, subdivision (c)(3), both of which permit a charge of murder "upon facts showing malice" that are "consistent with the holding of . . . *Watson* . . . ." (Italics added.)

In this case, defendant, highly intoxicated, drove his car down a heavily traveled high-speed thoroughfare, crossed into an oncoming lane, collided

with another car, and killed one of its occupants. The circumstances surrounding the accident and the history of defendant's prior intoxication-related encounters with the law provide substantial evidence to sustain the verdict of guilt of second degree murder.

Next, defendant contends his right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution is violated by section 22 if that law denies him the opportunity to have a jury decide he did not have the requisite mental state for the crime charged.

Due process imposes a substantive bar against conviction unless the state has proved beyond a reasonable doubt every fact constituting, in whole or in part, an element of a crime. This burden cannot be shifted to a defendant. (*Patterson* v. *New York* (1977) 432 U.S. 197, 204-205 [53 L.Ed.2d 281, 288-289, 97 S.Ct. 2319].) The constitutional guaranty "requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense . . . ." (*Id.* at p. 210 [53 L.Ed.2d at p. 292].) The stricture of section 22, however, creates no due process violation.

There is, of course, a simple answer to defendant's assertion: section 22 does not relieve the prosecution of its burden to prove, beyond a reasonable doubt, every element of implied-malice murder, as well as a union of act and intent (§ 20). But to leave the matter there would be to ignore a necessary implication of defendant's claim: that section 22 effectively denies him the opportunity to rebut proof of the subjective component of implied-malice murder.

We need not decide whether the question presented is the definition of implied-malice murder or a legislative determination that certain evidence is immaterial to negate the mental state necessary for that offense. In either event, due process is not violated. It is of paramount importance to realize that deference under the due process clause to a state's power to establish criminal liability turns on the historical existence of rules that affect defenses to crimes, whether by allocating evidentiary burdens (*Medina* v. *California* (1992) 505 U.S. __, __ [120 L.Ed.2d 353, 363, 112 S.Ct. 2572]) or by defining the elements of crimes (*Schad* v. *Arizona* (1991) 501 U.S. 624 [115 L.Ed.2d 555, 571, 111 S.Ct. 2491] (plur. opn.); accord, 501 U.S. at p. pp. 650-652 [115 L.Ed.2d at pp. 577-578] (opn. of Scalia, J., conc. in part and in judg.)).

"In the field of criminal law, we 'have defined the category of infractions that violate "fundamental fairness" very narrowly' based on the recognition that, '[b]eyond the specific guarantees enumerated in the Bill of Rights, the

Due Process Clause has limited operation.' " (*Medina* v. *California, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 362].) " 'Among other things, it is normally "within the power of the State to regulate procedures under which its [criminal] laws are carried out, including [evidentiary burden considerations]," and its decision in this regard is not subject to proscription under the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." . . .' [¶] . . . [B]ecause the States have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition, it is appropriate to exercise substantial deference to legislative judgments in this area. . . ." (505 U.S. at p. __ [120 L.Ed.2d at p. 363].) "Where a State's particular way of defining a crime has a long history, or is in widespread use, it is unlikely that a defendant will be able to demonstrate" a violation of the due process clause. (See *Schad* v. *Arizona, supra,* 501 U.S. at p. 640 [115 L.Ed.2d at pp. 570-571] (plur. opn.).)

The majority say it would be "unprecedented" to allow evidence of intoxication in express—but not implied-malice cases. They repeatedly describe their contrary conclusion as "well established." Their analysis is utterly ahistorical: it simply casts aside centuries of legal history.

Historically in this state and elsewhere, evidence of voluntary intoxication has been immaterial to defend against a second degree murder charge. More than a century ago, the United States Supreme Court explained, in a rare substantive law case considering instructional error in a trial in Utah Territory, "At common law, indeed, as a general rule, voluntary intoxication affords no excuse, justification, or extenuation of a crime committed under its influence. *United States* v. *Drew,* 5 Mas. 28; *United States* v. *McGlue,* 1 Curt. 1; *Commonwealth* v. *Hawkins,* 3 Gray (Mass.), 463; *People* v. *Rogers,* 18 N.Y. 9. But when a statute establishing different degrees of murder requires deliberate premeditation in order to constitute murder in the first degree, the question whether the accused is in such a condition of mind, by reason of drunkenness or otherwise, as to be capable of deliberate premeditation, necessarily becomes a material subject of consideration by the jury. The law has been repeatedly so ruled in the Supreme Judicial Court of Massachusetts in cases tried before a full court, one of which is reported upon other points (*Commonwealth* v. *Dorsey,* 103 Mass. 412); and in well-considered cases in courts of other States. *Pirtle* v. *State,* 9 Humph. (Tenn.) 663; *Haile* v. *State,* 11 id. 154; *Kelly* v. *Commonwealth,* 1 Grant (Pa.), Cas. 484; *Keenan* v. *Commonwealth,* 44 Pa. St. 55; *Jones* v. *Commonwealth,* 75 id. 403; *People* v. *Belencia,* 21 Cal. 544; *People* v. *Williams,* 43 id. 344; *State* v. *Johnson,* 40 Conn. 136, and 41 id. 584; *Pigman* v. *State of Ohio,* 14 Ohio, 555, 557. And the same rule is expressly enacted in the Penal Code of Utah,

sect. 20: 'No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.' Compiled Laws of Utah of 1876, pp. 568, 569." (*Hopt* v. *People* (1882) 104 U.S. (14 Otto) 631, 633-634 [26 L.Ed. 873, 874].)

The Utah Territorial Code section quoted in *Hopt* v. *People, supra*, 104 U.S. 631, is identical to the original text of section 22. Section 22 of the original Penal Code, enacted in 1872, declared: "DRUNKENNESS NO EXCUSE FOR CRIME. WHEN IT MAY BE CONSIDERED [Margin Note]. No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act." And we have interpreted the original text of section 22 as *Hopt* v. *People, supra*, 104 U.S. 631, did the Utah statute. In *People* v. *Vincent* (1892) 95 Cal. 425, 428-429 [30 P. 581], overruled on another point in *People* v. *Gorshen* (1959) 51 Cal.2d 716, 731-732, 734 [336 P.2d 492] (see fn. 3, *post*, p. 474), we stated of section 22's original text that "the degrees of murder are based upon the 'intent'—the deliberation or [premeditation]—with which the act is done; and therefore it is not improper, in trials for unlawful homicide, to instruct the jury that they can consider intoxication only for the purpose of determining the degree of the crime . . . ."

To be sure, the foregoing historical rule was briefly overlooked in a series of decisions of this court that permitted a defendant to introduce evidence of voluntary intoxication to show he or she lacked the mental state required for implied malice. (*People* v. *Saille, supra*, 54 Cal.3d 1103, 1108-1111.) This short interregnum is apparently the "well established" rule to which the majority refer. But due process is not violated because a legislature's longstanding historical rule is quite briefly altered by judicial decision.

Moreover, in considering the process due defendant, it is essential to keep in mind that the compromise to which the majority refer historically was not between murder and manslaughter, but between capital murder and murder merely carrying a prison term.

At the time section 22 was originally enacted, its language, harsh as it may sound to some today, was considered an enlightened reform. Initially in this

state, evidence of voluntary intoxication was irrelevant to defend against a murder charge. Voluntary intoxication was not a defense to murder of any kind in California and the killer went to the gallows, drunk or not at the time of the killing. Before the Legislature adopted our Penal Code, this state provided by statute that "Drunkenness shall not be an excuse for any crime" unless involuntarily induced by others to cause an offense to be committed. (Stats. 1850, ch. 99, § 8, p. 230.) With regard to murder, the law also specified: "Murder is the unlawful killing of a human being, with malice aforethought, either express or implied." (*Id.*, § 19, p. 231.) "Express malice is that deliberate intention unlawfully to take away the life of a fellow creature . . . ." (*Id.*, § 20, p. 231.) "Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart. The punishment of any person convicted of the crime of murder shall be death." (*Id.*, § 21, p. 231.)

Not until 1856 did the Legislature decree that murder would be of two degrees and only first degree murder would be punishable by death. (Stats. 1856, ch. 139, § 2, p. 219; see now Pen. Code, §§ 189, 190.)

English law, the history of which is essential to understanding the origin of section 22 and its predecessors, was similar, and its harsh effects lasted longer. It provided only for three types of felonious homicide: murder, manslaughter, and suicide. (2 Jones's Blackstone (1916) pp. 2387, 2390). Murder was described as "When a person, of sound memory and discretion, unlawfully killeth any reasonable creature in being and under the king's peace, with malice aforethought, either express or implied." (*Id.*, p. 2397, quoting 3 Coke (1641) Institutes of the Lawes of England 47.) The penalty for murder in England was death from the 16th century well into the 20th. (2 Jones's Blackstone, *op. cit. supra*, pp. 2406-2407); 101 Stats. at Large (Eng. 1861) 24 & 25 Vict., ch. 100, §§ 1, 2, p. 229 ["1. Whosoever shall be convicted of Murder shall suffer Death as a Felon. [¶] 2. Upon every Conviction for Murder the Court shall pronounce Sentence of Death . . . ."]; 9 Halsbury's Laws of England (2d ed. 1933) § 774, p. 454.)

The consequences of intoxication leading to killing were accordingly severe under early English law, as they were in California from 1850 to 1856 (Stats. 1850, ch. 99, § 21, p. 231; Stats. 1856, ch. 139, § 2, p. 219), for not only was murder always punished by death, but voluntary intoxication could never mitigate an offense. Rather, at least as a matter of policy, drunkenness was viewed to aggravate crime, because it voluntarily induced madness and because it was itself a crime. "[I]f a person that is drunk kills another, this shall be felony, and he shall be hanged for it, and yet he did it through ignorance, for when he was drunk he had no understanding nor memory; but

inasmuch as that ignorance was occasioned by his own act and folly, and he might have avoided it, he shall not be priviledged thereby. And Aristotle says, that such a man deserves double punishment, because he has doubly offended, viz. in being drunk to the evil example of others, and in committing the crime of homicide." (*Reniger* v. *Fogossa* (Ex.Ch. ca. 1551) 1 Plowd. 1, 19 [75 Eng.Reps. 1, 31], fn. omitted.)

Hence drunkenness was not a legal excuse. "The third sort of dementia is that, which is dementia affectata, namely drunkenness. This vice doth deprive men of the use of reason, and puts many men into a perfect, but temporary phrenzy; and therefore . . . such a person committing homicide shall not be punished simply for the crime of homicide, but shall suffer for his drunkenness answerable to the nature of the crime occasioned thereby; so that yet the formal cause of his punishment is rather the drunkenness, than the crime committed in it: but by the laws of England such a person shall have no privilege by this voluntary contracted madness, but shall have the same judgment as if he were in his right senses." (1 Hale, Pleas of the Crown (1680) pp. 31-33, italics deleted and fns. omitted.) "To the same effect is the passage in Hawkins' Pleas of the Crown, Book I., c. 1, s. 6: 'He who is guilty of any crime whatever through his voluntary drunkenness, shall be punished for it as much as if he had been sober.' Coke upon Littleton, 247a, similarly treats drunkenness as an aggravation of the offence. 'As for a drunkard who is voluntarius dæmon, he hath . . . no privilege thereby, but what hurt or ill soever he doth, his drunkenness doth aggravate it.' " (*Director of Public Prosecutions* v. *Beard* [1920] A.C. 479, 494-495 (per Lord Birkenhead); accord, 2 Jones's Blackstone, *op. cit. supra*, § 25, pp. 2186-2187 ["for drunkenness excites to and discloses every crime" and "the law of England . . . will not suffer any man thus to privilege one crime by another"].)

At the time our Penal Code was enacted American law also declared, purely as a matter of social policy, that voluntary drunkenness too naturally led to crime to excuse the same. The voluntary inebriate "may be perfectly unconscious of what he does, and yet he is responsible. . . . Public policy and public safety imperatively require that such should be the law." (*Boswell* v. *The Commonwealth* (1871) 61 Va. (20 Gratt.) 860, 872 [19 Michie's Ann. Va. Reps. 657, 661].) " '[A] man who voluntarily puts himself into a condition to have no control of his actions, must be held to intend the consequences.' " (*Roberts* v. *The People* (1870) 19 Mich. 401, 416, quoting *People* v. *Garbutt* (1868) 17 Mich. 9, 19.) "[I]t is argued that, because intoxication produces a state of mind that is easily excited by provocation, therefore the crimes committed under such intoxication and provocation are less criminal than when committed in a state of sobriety . . . . We are very

sure that no statute will ever announce such a rule . . . . [¶] . . . If such were the rule, a defendant would be much more likely to injure than to benefit his case by showing a good character, and the law would present no inducement to men to try to rise to the standard of even ordinary social morality. [¶] Of course it is impossible that such a principle can be a rule of law. . . . [¶] Indeed, if we admit the principle, and carry it out logically, we shall abolish law entirely as a compulsory rule of civil conduct . . . . Individual or even social charity may often act upon the principle [of judging conduct by the offender's conscience], but law excludes it from its sphere." (*Keenan* v. *Commonwealth* (1862) 44 Pa. 55, 58-59; see also the discussion of law and social policy in Note, *Constructive Murder—Drunkenness in Relation to Mens Rea* (1920) 34 Harv.L.Rev. 78.)

Nevertheless, the harshness of punishment for all murder prescribed by English law and its counterpart in the newly formed United States of America led to judicial or legislative reforms on both sides of the Atlantic at the end of the 18th century and in the early decades of the 19th century. (*Director of Public Prosecutions* v. *Beard, supra,* [1920] A.C. at pp. 495-500; Keedy, *History of the Pennsylvania Statute Creating Degrees of Murder* (1949) 97 U.Pa.L.Rev. 759, 767-770.)

In a major reform, the Pennsylvania Legislature, on April 22, 1794, passed a law that established degrees of murder. It decreed that the death penalty would be inflicted only for first degree murder. "And whereas the several offences, which are included under the general denomination of murder, differ so greatly from each other in the degree of their atrociousness that it is unjust to involve them in the same punishment: *Be it further enacted by the Authority aforesaid,* That all murder, which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder in the second degree . . . .'" (1794 Pa. Laws, ch. 1766, § 2, quoted in *Commonwealth* v. *Jones* (1974) 457 Pa. 563, 570-571 [319 A.2d 142, 147] (opn. of equally divided court).)

The Pennsylvania statute, which was apparently the first to divide murder into degrees (see *Commonwealth* v. *Redline* (1958) 391 Pa. 486 [137 A.2d 472, 475] & fn. 2), was adopted in the 19th century by many other states and territories (e.g., *ibid.*; *State* v. *Tatro* (1878) 50 Vt. 483, 491-492). As alluded to, California adopted its version of the Pennsylvania law reform in 1856. (Stats. 1856, ch. 139, § 2, p. 219; see now Pen. Code, §§ 189, 190.)

The benefit of the division of murder into degrees in this country soon inured to an intoxicated defendant's benefit. Although some jurisdictions

adhered to the severe rule that intoxication was of no moment in the consideration of any crime, even when a statute provided for degrees of murder (see *State* v. *Cross* (1858) 27 Mo. 332, 333-338; cf. *id.* at pp. 338-339 (dis. opn. of Richardson, J.); *Kenny* v. *People* (1865) 31 N.Y. 330, 337-338), others reasoned that although legal precedent forbade a defendant to introduce evidence of voluntary intoxication to palliate or excuse crime, such evidence could be used to show that the crime of first degree murder, with its accompanying penalty of death, was not committed at all. (*People* v. *Harris* (1866) 29 Cal. 678, 683-684.) Most first degree murder, other than felony murder, required the state to prove premeditation and deliberation; therefore the jury must consider evidence of intoxication, because that mental state was an essential element of the crime.

Thus as early as 1843 courts in states with degrees of murder declared that a jury could consider intoxication in deciding whether a killing was done with premeditation and deliberation. In *Swan* v. *The State* (1843) 23 Tenn. (4 Hum.) 136, the Supreme Court of Tennessee, a state that had adopted a statute similar to Pennsylvania's (*id.* at p. 142), declared, "although drunkenness, in point of law, constitutes no excuse or justification for crime, still, when the nature and essence of a crime is made, by law, to depend upon the peculiar state and condition of the criminal's mind at the time, . . . drunkenness, as a matter of fact affecting such state and condition of the mind, is a proper subject for the consideration and enquiry by the jury. The question in such case is, What is the mental status? Is it one . . . favorable to . . . deliberation and premeditation . . . [?] . . . To regard the fact of intoxication as meriting consideration in such a case, is not to hold that drunkenness will excuse crime, but to enquire whether the very crime which the law defines and punishes has, in point of fact, been committed." (*Id.* at pp. 141-142.)

Similarly, a century and a third ago, in *People* v. *Belencia* (1863) 21 Cal. 544, 545-546, this court held, "If [the murder] was deliberate and premeditated, it was murder of the first degree; otherwise, it was murder of the second degree; and in determining the degree any evidence tending to show the mental *status* of the defendant was a proper subject for the consideration of the jury. The fact that the defendant was drunk does not render the act less criminal, and in that sense it is not available as an excuse, but there is nothing in this to exclude it as evidence upon the question as to whether the act was deliberate and premeditated."

By the eighth decade of the nineteenth century it was well established that a defendant was entitled to an instruction on intoxication when premeditated and deliberate murder was charged. In *Jones* v. *Commonwealth* (1874) 75 Pa.

403, 406, the court stated plainly, "Intoxication is no excuse for crime; yet when it so clouds the intellect as to deprive it of the power to think and weigh the nature of the act committed, it may prevent a conviction of murder in the first degree." Connecticut, which had adopted the Pennsylvania statute, evidently in 1846 (*State* v. *Johnson* (1873) 40 Conn. 136, 137), decided that "on a trial for murder in the first degree, which, under our statute, requires *actual express malice*, the jury might and should take into consideration the fact of intoxication as tending to prove that such malice did not exist." (*State* v. *Johnson* (1874) 41 Conn. 584, 587.) Tennessee, in the interim, had continued to adhere to its pioneering view that the division of murder into degrees meant that a murder defendant could introduce evidence of intoxication to show a lack of the mental state required for the greater crime. (*Haile* v. *The State* (1850) 30 Tenn. (11 Hum.) 153; *Pirtle* v. *State* (1849) 28 Tenn. (9 Hum.) 663.)

Evidence of voluntary intoxication could be introduced in the degrees-of-murder states, however, only to fix a conviction at second degree murder; some other factor, such as sufficient provocation, was required to reduce the crime to manslaughter. There were, at the time our Penal Code was adopted, two reasons given for this conclusion—one based on the law, the other on social policy.

Policy is described above. With regard to the law, the courts declared that the specific intent to kill another human being was of the essence in finding proof of first degree murder, but was not an essential element of determining malice aforethought for second degree murder. Therefore, evidence of voluntary intoxication was not admissible, without more, to reduce an offense from murder to manslaughter. (*People* v. *Vincent, supra,* 95 Cal. 425, 428-429; *People* v. *Langton* (1885) 67 Cal. 427, 428-429 [7 P. 843], quoting *People* v. *Nichol* (1867) 34 Cal. 211; see also *People* v. *Williams* (1872) 43 Cal. 344; and see *State* v. *Johnson, supra,* 41 Conn. 584, 586-587 [discussing implied malice aforethought]; *Haile* v. *The State, supra,* 30 Tenn. (11 Hum.) 153, 156-157 [discussing express malice aforethought].) "The characteristic quality of [premeditated and deliberated first degree murder], and that which distinguishes it from murder in the second degree . . . is the existence of a settled purpose and fixed design, on the part of the assailant, that the act of assault should result in the death of the party assailed; that death being the end aimed at, the object sought for and wished." (*Swan* v. *The State, supra,* 23 Tenn. (4 Hum.) 136, 139.)[3]

To be sure, California law requires proof of a union of act and intent for conviction of an offense. But the intent is supplied, in the case of implied-malice murder, by the intent to become intoxicated: that elementary intent

---

[3]*People* v. *Belencia, supra,* 21 Cal. 544, *People* v. *Vincent, supra,* 95 Cal. 425, *People* v. *Langton, supra,* 67 Cal. 427, *People* v. *Nichol, supra,* 34 Cal. 211, and *People* v. *Williams, supra,* 43 Cal. 344, were all overruled in *People* v. *Gorshen, supra,* 51 Cal.2d 716, 731-732,

becomes, as it were, a placeholder for the requirement that the actor be subjectively aware of the risk in order to be convicted of implied-malice murder. (Model Pen. Code, § 2.08, subd. (2) ["When recklessness establishes an element of the offense, if the actor, due to self-induced intoxication, is unaware of a risk of which he would have been aware had he been sober, such unawareness is immaterial."].) The Model Penal Code states that voluntarily becoming drunk satisfies the requisite *mental state* (although not the requirement of a highly dangerous physical act) for conviction of implied-malice murder, with its essential mental state of recklessness, unless some other factor such as sufficient provocation operates to negate malice. Cases dating approximately to the time of our Penal Code's enactment ascribed to voluntary intoxication a similar, if perhaps less precisely formulated, effect on proof of malice. Malice "comprehends not only a particular ill-will, but every case where there is . . . cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." (*Commonwealth* v. *Drum* (1868) 58 Pa. 9, 15.) Thus " '[a] man may be guilty of murder without intending to take life. . . . [And] the doctrine of the courts is, that the intention to drink may fully supply the place of malice aforethought; so that if one voluntarily becomes so drunk as not to know what he is about, and then with a deadly weapon kills a man, the killing will be murder, the same as if he were sober.' " (*Wood* v. *The State* (1879) 34 Ark. 341, 343, quoting 1 Bishop's Criminal Law, § 401.) "Intoxication, therefore, so far from disproving malice, is itself a circumstance from which malice may be implied." (*State* v. *Johnson, supra,* 41 Conn. 584, 588.) "Or, still again, drunkenness may quite supply the place of malice aforethought, which may be general, not special, but it cannot that of a specific intent." (*The State* v. *Bell* (1870) 29 Iowa 316, 320, italics added.)

Because evidence of voluntary intoxication historically has been immaterial to defend against a charge of second degree murder, a fortiori it cannot be material to disprove the conscious and antisocial disregard for human life component of implied-malice murder, for an evidentiary fact is immaterial to prove its opposite. "The law often implies malice from the manner in which the killing was done . . . . In such case, it is murder, though the perpetrator was drunk. . . . The law in such cases, does not seek to ascertain the actual state of the perpetrator's mind, for the fact from which malice is implied having been proved, the law presumes its existence, *and proof in opposition*

---

734, which, noting that former section 22 referred both to "species" and "degree[s]" of crime, disagreed with their conclusion that voluntary intoxication could not be considered to reduce an offense from murder to manslaughter. Although *Gorshen*'s reasoning was certainly plausible in light of the language of former section 22, the effect of the Legislature's 1981 and 1982 amendments to section 22 has been to revive the authority of the overruled early cases.

*to this presumption, is irrelevant and inadmissible.* Hence, a party cannot show that he was so drunk as not to be capable of entertaining a malicious feeling. The conclusion of law is against him." (*Haile* v. *The State, supra,* 30 Tenn. (11 Hum.) 153, 157, italics added.) California law has followed that historical principle not only in section 22 but also in cases such as *Watson, supra,* 30 Cal.3d 290: evidence of voluntary intoxication followed by reckless behavior allows a trier of fact to conclude that the actor held a conscious and antisocial disregard for human life.

The foregoing historical analysis has been set forth at some length because at first blush defendant's due process argument appears arguable, and it requires a substantial response. In light of the historical rules governing intoxication and unlawful homicide, his argument must fail. A historical analysis should also set into greater relief the meaning of former section 22 as enacted in 1872—a meaning that, as explained, was not liberalized in 1982 when the Legislature enacted the current version of that section.

Defendant next asserts that section 22 cannot be applied to him personally. In his view, to apply the statute retroactively to his own disadvantage would violate due process of law.

I disagree. Section 22 was enacted in its present form in 1982. *People* v. *Hood, supra,* 1 Cal.3d 444, has explained the difference between general and specific intent offenses since 1969, and *Watson, supra,* 30 Cal.3d 290, has set forth the definition of the objective physical act and subjective mental state required for implied-malice murder since 1981.

Defendant received more than he was entitled to when the court instructed the jury that it could consider defendant's voluntary intoxication for the existence *or nonexistence* of implied malice aforethought—for, as explained, evidence of voluntary intoxication is immaterial to disprove implied malice aforethought. Any decision implying or stating the contrary is erroneous. (See, e.g., *People* v. *Talamantes* (1992) 11 Cal.App.4th 968, 974-975 [14 Cal.Rptr.2d 311]; *People* v. *Alvarado, supra,* 232 Cal.App.3d 501; *People* v. *Ricardi, supra,* 221 Cal.App.3d 249; *People* v. *Ricardi, supra,* 9 Cal.App.4th 1427.)

Finally, defendant contends in effect that equal punishment requires equal moral blame, and that "[i]t makes no sense to prevent a defendant from demonstrating that intoxication eliminated the subjective appreciation of risk necessary for implied malice murder, while allowing him to show that same intoxication negated express malice." But he does not identify any constitutional violation in the Legislature's choice.

I therefore concur with the majority that the Court of Appeal's judgment should be affirmed. But I cannot subscribe to the majority's erroneous view of the law.

Lucas, C. J., concurred.

**BAXTER, J.,** Concurring and Dissenting.—On the following points, I agree with Justice Mosk. Implied malice may be a specific mental state, but it is not a specific intent. Thus, murder based on implied malice is not a specific intent crime. Penal Code section 22, subdivision (b), as amended in 1982, is an exception to the rule that "[n]o act . . . is less criminal by reason of" the perpetrator's voluntary intoxication (*id.*, subd. (a)); by its express terms, the exception applies only "when a specific intent crime is charged." Hence, the statute withholds voluntary intoxication as a defense to implied-malice murder. This statutory decision accords with long-established principles of Anglo-American and California law. Its purpose is clear and sound. In its absence, an irresponsible decision to get drunk could become the means of escaping full liability for the wanton, heedless violence which intoxication is so inclined to produce. The Legislature was entitled to prevent that anomaly. Its choice does not offend due process. Accordingly, defendant was not entitled to an instruction which implied that he could not be guilty of drunk-driving murder if the jury found him to have been unconscious, as a result of voluntary intoxication, at the time of the collision.

In my view, this is all we need to decide. Given the particular difficulty of this area of law, wisdom counsels against saying more than is absolutely necessary. Therefore, I express no view on any other matter discussed in the other opinions in this case.

Appellant's petition for a rehearing was denied January 13, 1994. Mosk, J., was of the opinion that the petition should be granted.