Filed 8/18/15  P. v. Lane CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039862 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1196735) |
| v. | |
| BRANDON CARL LANE, | |
| Defendant and Appellant. | |

A jury convicted defendant Brandon Carl Lane of second degree murder (Pen. Code, § 187)[1] and found true an allegation that he personally used a deadly and dangerous weapon in committing the crime (§ 12022, subd. (b)(1)).  The trial court sentenced him to an indeterminate term of 16 years to life in prison.

On appeal, defendant contends that (1) the trial court erred in instructing the jury with CALCRIM No. 625, which he asserts is incorrect; (2) the trial court improperly admitted hearsay testimony about defendant's military service; and (3) the cumulative effect of these errors requires reversal.  We affirm.

---

[1]     Further statutory references are to the Penal Code unless otherwise noted.

I. Background

In the morning on April 23, 2010, police responded to a report of a suspicious death at the St. Francis Motel in Santa Clara.  They found the body of a white male "on the bed all bloody" in an upstairs room.  There was "blood spatter, blood transfer, all over the room" and blood smears on the bathroom counter and light switch.  A floor lamp by the door was broken, but the room had not been ransacked.

The TV was on.  There were several vodka bottles on the dresser, one of them unopened.  A backpack in the middle of the floor contained a wallet, a checkbook, bank cards, and other items.  The backpack was unzipped, and blood and an empty leather sheaf for a buck knife were found in one of the pockets.  A bloody towel from the motel was found half a block away.  The knife was never recovered.

The victim was identified as Matthew Brettner.  An autopsy determined that he had been stabbed in the neck with a "sharp force instrument" that the medical examiner believed severed an artery.  Brettner also had two "slashing" or "slicing" wounds to his neck.  His thyroid cartilage was fractured consistent with strangulation or attempted strangulation, although that was not the cause of death.  There were two stab wounds to the left side of Brettner's chest, one of them almost five inches deep.  There were abrasions and blunt force contusions on the left side of his face and multiple "defensive wounds" on his hands.  There were human bite wounds on his left cheek and on the inside of his left forearm.  The medical examiner concluded that Brettner bled to death from a stab wound to the left side of his neck.  His blood alcohol level was 0.35 at the time of death.

A security video from the motel showed defendant leaving with a towel in his hand around 6:30 a.m. on April 23, 2010.  DNA testing identified him as a major contributor and Brettner as a minor contributor to the DNA on the towel.  The blood in the backpack was defendant's.  Brettner was a major contributor and defendant was a

2

minor contributor to blood samples taken from the threshold and the door to the motel room.

Defendant was arrested on January 1, 2011, for Brettner's murder. He denied ever having been at the motel.[2] He later told police he was there once "like two or three years ago" doing drugs and that was the "only time" he was "ever" at the motel.

He changed his story when police showed him a still picture from the April 22, 2010 security video. He told them he was drinking in a room that night with "a white guy and a Mexican guy" and that he did not know their names. He described the "Mexican guy" in detail and identified a photograph of Brettner as "the white guy." He maintained that nothing happened that night. The other guys were drinking vodka and he was drinking Jack Daniels "until [his bottle] was empty and I guess I started hitting their vodka." He passed out, and when he came to the next morning, he "just left." The other two were asleep, the white guy in the bed and the "Mexican guy" on the floor.

Defendant eventually conceded that he "fabricated" the "Mexican guy." When police told him that they knew "for sure that you guys were fighting," that they "hurt each other," and that he "threw something" into the bushes after he left the motel, defendant changed his story again. He told police that he and Brettner "were just drinking and then all of a sudden he pulls a knife out and says, 'You've got to leave.'" He "pulls the knife, cuts me in my hand." "I get mad at him." "I think I took the knife from him and I hit him. I jabbed him in the neck . . . ." Brettner was "laying down" when defendant stabbed him. Defendant "passed out" and when he woke up, "I see this body on the bed." Defendant passed out again, woke up, washed his hands, and left. He threw the towel in the bushes and the knife in the Guadalupe River.

---

[2]     The videotape of defendant's January 1, 2011 police interview was played for the jury at trial, and jurors were also given transcripts of the interview.

Defendant eventually admitted that he stabbed Brettner "[m]aybe four" times in the neck. The fight was "pretty quick"—"maybe about a minute." It took the victim "ten minutes" to die. Defendant's only injury was "that one cut" on his hand. "There wasn't a lot of blood because [Brettner] was laying [*sic*] down and he never got back up . . . . It wasn't like he came at [defendant] and got his blood all over [him]." Defendant told police that once he took the knife away from Brettner, he no longer felt that Brettner was a threat. "No, not at all." He acknowledged that he could have left and taken the knife with him. He stabbed Brettner "cause he was still . . . he was just being . . . you know. We were fighting." Defendant was asked, "When . . . you saw his hands go up, what were you thinking? [H]e's on the bed, hands up, like this. What are you thinking?" The record reflects defendant's response: "I'm thinking he's bleeding to death right now. (laughing) He is already bleeding." Defendant told police that the stab wounds to Brettner's hands were "probably defensive wounds." He continued to stab Brettner "[b]ecause I was pretty pissed off." "Because he pulled a knife on me and he cut me. I was furious."

Trial testimony established that Brettner had been living at the motel for more than a month. His mother paid for the room so he would not be homeless. He was 43 years old and an alcoholic. One of the residents testified that Brettner drank alcohol "all the time." That resident never had any problems with Brettner and never saw him having problems with any of the other residents. The night manager of the motel testified that he never had any problems with Brettner. He believed that Brettner "was handicapped in a certain way . . . ." Brettner "walked very slowly, like he had . . . an injury or something."

The night manager testified that he saw Brettner and an African-American man drinking on the balcony in front of Brettner's room around 9:30 p.m. on April 22, 2010. A resident of the hotel identified defendant as the man he saw on the balcony with Brettner sometime after 8:30 that evening.

4

Jeremy Fadlin and his girlfriend occupied the room next door to Brettner's that night. Fadlin testified that when he got to his room at around 5:00 p.m., Brettner was on the balcony smoking a cigar and talking to somebody. Later that night, Fadlin heard a knock next door. "And then I just kind of hear like a scuffle, 'Hey; what are you doing?' and then like . . . ." Fadlin had heard "the white guy" talking outside his room earlier, and the person who said, "'Hey; what are you doing?'" sounded like the white guy. The scuffle that followed "almost sounded like a choking, you know, like a blade to the neck, like, you know, somebody gargling on blood almost." Fadlin said, "it's the only way I know to describe it to you, you know. I lived in Jamaica for some time. I lived in Haiti. I lived in [the] Bahamas . . . . It's one thing I know is someone getting stuck with a blade . . . ." "[T]hat's what it sounded like to me and it told me it was time to go." Fadlin heard "like a little bang, like a thud, too, like, you know, somebody hitting the wall and then, like, hitting the floor, so yeah, time to go." He and his girlfriend checked out around 10:40 p.m.

The resident of the room directly below Brettner's testified that he heard a bang around 11:00 that night. It sounded like "taking a bowling ball and dropping it on the floor" of the room above his. Later, "loud voice noises" from the room above woke him up. He heard a man's voice "moaning" for 10 to 15 minutes. He got up around 4:30 the next morning and heard "[a] lot of walking around" in the room above him before he left for work at 5:30 a.m.

Defendant testified in his own behalf. He was homeless and an alcoholic in April 2010. He was drinking on the grass at Taco Bell on April 22, 2010. He met Brettner, who invited him to drink in his motel room. Defendant went to the motel around 9:00 p.m. Brettner was standing outside his room smoking a cigar and drinking vodka punch. They "chatted a little bit" and then went inside to watch a basketball game. There was "[n]o tension." Brettner was standing and drinking "where the dresser is at"

5

and defendant was sitting on the corner of the bed watching TV. Brettner went "back and forth, going outside, smoking, coming back." The two were "getting along."

At some point, Brettner pulled a buck knife out of his pocket and "started flicking it . . . open, close[d]." Defendant continued watching TV. When he finished his Jack Daniels, he "went over and . . . poured some of that punch into a glass and had some of his vodka." Brettner "just decided he wanted me to leave and just abruptly said, 'Hey; you got to leave.'" He "came at" defendant with the knife and cut defendant's hand, which started to bleed. Defendant was "[s]urprised" and reacted with "[a]nger." He asked Brettner, "What the fuck are you doing?" and punched him in the face. Brettner pushed defendant against the wall. Defendant bit Brettner on the arm and took the knife away from him. He stabbed Brettner in the neck but Brettner "still kept coming at [him]." They ended up on the bed, still fighting, and defendant "stabbed [Brettner] one last time." He "believe[d]" he cut Brettner on the neck when he was holding the knife sideways. He did not remember stabbing Brettner in the chest. Brettner "started weakening" and defendant "panicked." He tried to stop the bleeding by applying pressure to the neck wound but Brettner stopped breathing. Defendant did not call 911 because he was "afraid to go to jail." He sat down in a chair and passed out.

Defendant woke up the next morning and washed his hands. He looked in Brettner's backpack because he wanted to know his name, found a wallet that contained identification, and then put it back in the backpack. He left the motel before dawn, taking the knife and the cup he had been drinking from with him. He also took a towel because the cut on his hand was "still bleeding." He threw the towel in the bushes and the knife in the Guadalupe River. He was "somewhat" getting his life back in order when he was arrested on January 1, 2011.

Defendant admitted that he had been convicted for crimes of violence. He also admitted that he told "a lot of lies" during his January 1, 2011 police interview. He conceded that he adjusted his story each time it became apparent that police "had

6

something that showed that what [he] was telling them then just wasn't true." He admitted that his trial testimony included details he did not mention in his police interview. He acknowledged that all the jury had to rely on was his word "that now you're telling the truth."

The defense called Brettner's family members and others to testify about his character for violence. A former girlfriend testified that he was a violent man. Brettner's mother testified that he pushed her violently to the ground on several occasions and that he "trashed" her house with a lead pipe in 2002. Brettner's estranged wife testified that he suffered from bipolar disorder and that he regularly hit her and their children. He also threatened to kill her. But "he just did it to family 'cause he could keep his cool outside of the house . . . . He didn't pick on people outside the house; only his family."

The majority of the violent incidents that witnesses described occurred before 2004, when Brettner absconded from probation and moved to Hawaii. A cliff diving accident in 2004 left him partially paralyzed. "[H]e never got full uses [*sic*] back of his arm or leg . . . ." "[H]e couldn't walk normally." "He couldn't really hear well out of one ear and he couldn't see that well out of one eye." He called the right side of his body "his dead side." He "could move, but not control" his right arm. He taught himself to write left-handed but "you could barely read it."

In her closing argument, the prosecutor urged a first degree or "at the very least" a second degree murder conviction given the nature of Brettner's injuries, forensic evidence consistent with a finding that defendant closed the motel room door sometime after the fight began, and defendant's conduct after the murder. The prosecutor argued that a finding that defendant closed the door would negate his claims of acting in self-defense or in the heat of passion. "A person who's acting in self-defense or [who] believes [himself] to be acting in self-defense, does not close off [his] only route of egress." "A person . . . who's acting from passion rather than judgment, doesn't have the ability to think to close that door to hide what [he's] doing."

7

The defense argued that defendant "was involved in a life or death struggle" that night with "a very, very violent man." If Brettner came at defendant with a knife and cut him, "then there's clearly provocation. It's going to be up to you at that point to decide whether or not that provocation results in a perfect self-defense, meaning [defendant] is guilty of nothing, or whether it results in a manslaughter because it was either imperfect self-defense or done in the heat of passion." Neither the prosecutor nor defense counsel focused on defendant's asserted intoxication in connection with his claim of self-defense.

After deliberating for approximately 10 hours, the jury found defendant not guilty of first degree murder and guilty of second degree murder. The jury also found the personal use allegation true. Defendant was sentenced to an indeterminate term of 16 years to life in prison. He filed a timely notice of appeal.

## II. Discussion

### A. Alleged Instructional Error

#### 1. Background

The trial court gave instructions, among others, on first degree murder and on express malice and implied malice second degree murder (CALCRIM Nos. 500, 520, 521). It also gave instructions on the lesser included offense of voluntary manslaughter, both on the theory that the killing occurred intentionally during a sudden quarrel or in the heat of passion and on the theory that the killing occurred in an honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury (CALCRIM Nos. 522, 570, 571). The court gave CALCRIM No. 625 on voluntary intoxication.

#### 2. Analysis

Defendant contends that the trial court erred in instructing the jury that it could consider evidence of defendant's voluntary intoxication only in a limited way. He argues that CALCRIM No. 625 "effectively told the jury that it could not consider [his]

8

intoxication in determining the honesty or actuality of [his] beliefs (1) as to whether the danger of death or [great bodily injury] was imminent [and] (2) as to whether the immediate use of deadly force was necessary." He claims the court had a sua sponte duty to instruct the jury that voluntary intoxication (1) "may affect the defendant's belief in the imminence of an aggravated assault . . . and [his] belief in the need to exercise deadly force to prevent that aggravated assault," and (2) "is also relevant to the actuality (honesty) of the defendant's belief in the need for immediate use of deadly force."

The Attorney General counters that CALCRIM No. 625 has been held to be a correct statement of the law, which is not surprising since the instruction "reiterate[s] the rule enunciated in former Penal Code section 22" as amended in 1995.[3] She contends that the trial court could not have committed error by instructing the jury that it could not "'consider evidence of voluntary intoxication for any other purpose'" than to negate intent to kill, premeditation, or deliberation because that rule "is dictated by statute." She further contends that if defendant wanted the trial court to instruct on the significance of voluntary intoxication with respect to heat of passion or imperfect self-defense, he should have requested a pinpoint instruction, and his failure to do so bars his claim of error on appeal. Defendant replies that if the trial court instructs on intoxication, it has a sua sponte duty to instruct "correctly." We conclude that the Attorney General is correct.

Former section 22 has long governed the admissibility of evidence of a defendant's voluntary intoxication in a criminal case. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1123-1124 (*Mendoza*).) Before 1981, voluntary intoxication "was generally relevant to the defense of diminished capacity" and "could negate malice, both express and implied, and/or intent to kill." (*Id.* at p. 1125; *People v. Turk* (2008) 164 Cal.App.4th 1361, 1376 (*Turk*).) In 1981, the Legislature abolished the defense of

---

[3] Former section 22 was renumbered section 29.4 in 2012. (Stats. 2012, ch. 162, § 119, p. 2617.) Since defendant was tried before the amendment's January 1, 2013 effective date, we will refer to the statute as former section 22.

diminished capacity "while preserving the relevance of voluntary intoxication to . . . whether the defendant *actually* had the necessary mental state for the charged offense." (*Mendoza*, at p. 1125; *People v. Saille* (1991) 54 Cal.3d 1103, 1116-1117 (*Saille*).)  In 1994, the California Supreme Court held that evidence of voluntary intoxication was admissible under former section 22 on "the question whether the defendant harbored malice aforethought, whether such malice is express or implied." (*People v. Whitfield* (1994) 7 Cal.4th 437, 441, 446 (*Whitfield*).)  The Legislature reacted to *Whitfield*'s holding by amending the statute in 1995.  (*Mendoza*, at p. 1126.)  The legislative history of the 1995 amendment "unequivocally indicates that the Legislature intended to legislatively supersede *Whitfield*, and make voluntary intoxication inadmissible to negate implied malice in cases in which a defendant is charged with murder." (*Turk*, *supra*, 164 Cal.App.4th at p. 1375; see *People v. Boyer* (2006) 38 Cal.4th 412, 469, fn. 40, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) The California Supreme Court has rejected the argument that the exclusion of evidence of a defendant's voluntary intoxication under former section 22 violates due process by denying the defendant the opportunity to prove that he did not have the required mental state.  (*People v. Atkins* (2001) 25 Cal.4th 76, 93, citing *Montana v. Egelhoff* (1996) 518 U.S. 37, 39-40, 56.)

Thus, at the time of defendant's 2012 trial, former section 22 as amended provided that "(a)  No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition.  Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.  [¶]  (b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder,

whether the defendant premeditated, deliberated, or harbored express malice aforethought." (Former § 22; Stats. 1995, ch. 793, § 1.)

CALCRIM No. 625 "is true to section 22, as amended" in 1995. (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1298 (*Timms*).) As given here, it told the jury that "[y]ou may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation. A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance, knowing that it would produce an intoxicating factor, willingly assuming the risk of that effect. You may not consider evidence of voluntary intoxication for any other purpose." This instruction correctly states the law on the admissibility of evidence of a defendant's voluntary intoxication. (Former § 22; *Timms*, at p. 1298; *Turk*, *supra*, 164 Cal.App.4th at p. 1381.)

Defendant argues, however, that the instruction improperly prevented the jury from considering whether his voluntary intoxication affected his actual but unreasonable beliefs that a danger of death or great bodily injury was imminent and that he needed to use deadly force. He argues that the trial court had an obligation to instruct the jury sua sponte that it could consider evidence of voluntary intoxication for that purpose. We disagree.

" '[A]n instruction on the significance of voluntary intoxication is a "pinpoint" instruction that the trial court is not required to give unless requested by the defendant.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 295 (*Verdugo*).) "This is so because the defendant's evidence of intoxication can no longer be proffered as a defense to a crime but rather is proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt. In such a case the defendant is attempting to relate his evidence of intoxication to an element of the crime. Accordingly, he may seek a 'pinpoint' instruction that must be requested by him [citation], but such a

11

pinpoint instruction does not involve a 'general principle of law' as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court." (*Saille*, *supra*, 54 Cal.3d at p. 1120.)  Here, the trial court did not have a sua sponte duty to instruct the jury that it could consider evidence of defendant's intoxication when considering his claim of imperfect self-defense.  (*Ibid.*)  Defendant's failure to request a pinpoint instruction has forfeited his claim of error on appeal.  (*People v. Jennings* (2010) 50 Cal.4th 616, 675 (*Jennings*).)

　　*People v. Cameron* (1994) 30 Cal.App.4th 591 (*Cameron*) does not change our opinion.  In *Cameron*, the trial court instructed the jury pursuant to former CALJIC No. 4.20 that second degree implied malice murder was a general intent crime and that voluntary intoxication was not a defense to general intent crimes.  (*Cameron*, at p. 599.)  The appellate court found the instruction misleading because it implied that the jury should disregard evidence of voluntary intoxication in determining whether Cameron acted with actual knowledge of life endangerment and conscious disregard for life.  (*Id.* at p. 600.)  Relying on *Whitfield*, the court held that voluntary intoxication was material to a finding of implied malice where that is an element of second degree murder and that second degree murder with implied malice was "a 'specific intent crime' " as former section 22 defined that term.  (*Cameron*, at p. 599, quoting *Whitfield*, *supra*, 7 Cal.4th at pp. 450-451.)  The *Cameron* court rejected the prosecution's argument that the error was harmless, noting that the instruction also had a bearing on other partial defense theories, including imperfect self-defense.  The court stated in that regard that "[p]roof of intoxication tends to support a claim of honest but mistaken belief in an imminent aggravated assault, providing a reason to account for the defendant's objectively unreasonable belief."  (*Id.* at p. 601.)

　　*Cameron* does not advance defendant's position.  The case was decided before the 1995 amendment to former section 22 specifically abrogated *Whitfield.*  (Stats. 1995, ch.

12

793, § 1, p. 6149.) The abrogation of *Whitfield* effectively abrogated *Cameron*'s holding that voluntary intoxication could be used to negate implied malice.

The *Cameron* court's statement that proof of voluntary intoxication is relevant in determining the subjective components of an imperfect self-defense claim does not help defendant either. "It is well settled that '[a]n instruction on the significance of voluntary intoxication is a "pinpoint" instruction . . . .'" (*Verdugo*, *supra*, 50 Cal.4th at p. 295.) Defendant failed to request such an instruction here, thus forfeiting his claim.

Defendant's reliance on *Mendoza* is also misplaced. The *Mendoza* court considered whether former section 22 permitted defendants tried as aiders and abettors to present evidence of voluntary intoxication for the jury to consider in determining whether they had the requisite mental states of knowledge and intent. (*Mendoza*, *supra*, 18 Cal.4th at p. 1126.) The *Mendoza* court rejected the Attorney General's argument that neither intent nor knowledge was "'a required specific intent'" under former section 22. (*Mendoza*, at pp. 1126-1131.) The *Mendoza* court's "very narrow" holding was that "[d]efendants may present evidence of intoxication solely on the question whether they are liable for criminal acts as aiders and abettors." (*Id*. at p. 1133.) That holding has no application here, where defendant was not charged with aiding and abetting any crime.

In his supplemental reply brief, defendant argues that the disjunctive "or" in former section 22 allows the trier of fact to consider a defendant's voluntary intoxication in determining whether he acted in imperfect self-defense. Even if we assume that it does, defendant forfeited the argument by failing to request a pinpoint instruction in the trial court. (*Verdugo*, *supra*, 50 Cal.4th at p. 295; *Jennings*, *supra*, 50 Cal.4th at p. 675.)

## B. Alleged Ineffective Assistance of Counsel

Defendant contends that his trial counsel's failure to request "a correct instruction" constituted ineffective assistance of counsel. We disagree.

13

A defendant seeking reversal for ineffective assistance of counsel must prove both deficient performance and prejudice. (*People v. Ledesma* (1987) 43 Cal.3d 171, 218; *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) When counsel's conduct can reasonably be attributed to sound strategy, a reviewing court will presume the conduct was the result of a competent tactical decision, and defendant must overcome that presumption to establish ineffective assistance. (*Strickland*, at p. 687.) "Second, the defendant must show that the deficient performance prejudiced the defense." (*Ibid*.) A court deciding an ineffective assistance claim does not need to address the elements in order, or even to address both elements if the defendant makes an insufficient showing on one. (*Id*. at p. 697.)

Here, we have rejected defendant's claim of instructional error. Because CALCRIM No. 625 correctly states the law, defendant's trial counsel cannot be faulted for failing to request "a correct instruction." The failure to make a meritless argument is not deficient performance. (See *Strickland*, *supra*, 466 U.S. at p. 676.) To the extent defendant contends that his counsel should have requested a pinpoint instruction on the significance of voluntary intoxication to his claim of imperfect self-defense, he has failed to establish deficient performance. Counsel could reasonably have determined that a pinpoint instruction was not warranted given defendant's unequivocal trial testimony that he would have perceived Brettner as a threat and would have felt the need "to defend" himself and "to continue defending" himself with the knife even if he was "completely sober." We cannot say that counsel's determination was not a competent tactical decision. (*Id*. at p. 687.) Defendant's claim of ineffective assistance fails.

### C. Alleged Improper Admission of Evidence

### 1. Background

At the beginning of his January 1, 2011 interview, defendant told police that he suffered from "post-traumatic stress and depression from being in the service." He

claimed to be a former Navy SEAL who had served in Desert Storm and also in "Grenada, Somalia, Afghanistan [and] Beirut at different times." He said that his discharge was "other than honorable" because he "punched an officer." He explained, "[W]e went on a mission and got some bad intel and most of my buddies got killed. Twelve of them to be exact and I came back. [The officer] was really nonchalant and he just made a statement that really didn't appeal to me in reference to everybody else dying and 'how come you're not dead' so I punched him."

At trial, defendant admitted that this story was completely false. He spent two years in the Navy but he was never a Navy SEAL. He had never seen combat. He lied so that the officers interviewing him would "have a better outlook on me." "So they'd like me."

Santa Clara Police Lieutenant Brian Gilbert was one of the officers who interviewed defendant. On rebuttal, Gilbert testified that his report summarizing defendant's police interview included a section summarizing information that Gilbert obtained after the interview. A paragraph from that section was read to the jury over defense counsel's hearsay objection after the trial court instructed the jury that "this evidence is being allowed not for the truth of what is said, but only to show the effect that it had, if it did -- that's up to you to find -- the effect that it had on anyone who read this in the [police] report, including [defendant]." In the challenged paragraph, Gilbert wrote that he contacted the Naval Criminal Investigative Service after defendant's interview. He learned that defendant had served in the Navy in the early 1980's, that he had received an other-than-honorable discharge, and that the reason for the discharge was a pattern of misconduct. Gilbert also learned that defendant was never a Navy SEAL and that it was impossible for him to have served in combat in all of the locations he listed. Gilbert confirmed that he wrote the paragraph. Defense counsel declined to cross-examine Gilbert.

15

## 2. Analysis

Defendant contends that Gilbert's testimony was "indisputably" hearsay that the trial court improperly admitted in violation of his Sixth and Fourteenth Amendment rights to confrontation. We disagree.

"'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200.) "An out-of-court statement is properly admitted if a nonhearsay purpose for admitting the statement is identified, and the nonhearsay purpose is relevant to an issue in dispute. [Citations.]" (*People v. Turner* (1994) 8 Cal.4th 137, 189 (*Turner*), overruled on another ground in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5, disapproved on a different ground in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.) "'"[O]ne important category of nonhearsay evidence [is] evidence of a declarant's statement that is offered to prove that the statement imparted certain information to the hearer and that the hearer, believing such information to be true, acted in conformity with that belief. The statement is not hearsay, since it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement."' [Citations.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1162 (*Livingston*).)

The "hearsay" evidence that defendant challenges here was not hearsay because it was not admitted for the truth of the matter. (*Livingston*, *supra*, 53 Cal.4th at p. 1162.) The trial court properly so instructed the jury, and "[w]e presume that the jury followed the court's instructions." (*Turner*, *supra*, 8 Cal.4th at p. 190.)

Defendant complains that the trial court's explanation "did not supply any valid exception to the hearsay rule." The contention lacks merit. The evidence was nonhearsay. Thus, its admission did not turn on whether it fell within an exception to the hearsay rule.

16

To the extent defendant contends that the effect of the information on defendant is irrelevant, he forfeited that argument by failing to raise it below. (Evid. Code, § 353; *People v. Mickle* (1991) 54 Cal.3d 140, 187 & fn. 31.) It lacks merit in any event. Defendant's credibility was a key issue at trial. Only he knew what happened in the motel room that night. The variety of false stories that he told police during his interview supported an inference that the story he told at trial was similarly false. On the other hand, the fact that he freely admitted lying about his supposed career as a Navy SEAL tended to support an inference that he might be telling the truth about other issues at trial. Any such inference would be significantly weakened, however, if the reason defendant admitted lying about his Navy career was because he knew (or his trial counsel told him) that Gilbert had followed up with NCIS and that the truth would no doubt be revealed at trial. Thus, the challenged testimony was relevant to show the effect (if any) of the information on defendant. (*Livingston*, *supra*, 53 Cal.4th at p. 1162.) We conclude that the admission of the challenged testimony was not an abuse of the trial court's discretion. Nor did it violate defendant's Sixth Amendment right to confront the NCIS representative. (*Livingston*, at pp. 1163-1164 ["'[T]here are no confrontation clause restrictions on the introduction of out-of-court statements for *nonhearsay* purposes.'"].)

### D. Cumulative Error

Defendant contends that the cumulative effect of the trial court's errors warrants reversal. We have rejected all of his claims of error. There is no prejudice to cumulate. (*People v. Myles* (2012) 53 Cal.4th 1181, 1225.)

### III. Disposition

The judgment is affirmed.

17

_____
Mihara, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P. J.



_____
Grover, J.

18