Filed 5/9/23  P. v. Donahue CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B317638 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA102832) |
| v. | |
| RONALD TITUS DONAHUE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Hector M. Guzman, Judge.  Affirmed.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Mathews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

# I.    INTRODUCTION

At trial, defendant Ronald Titus Donahue admitted that, during a murder-for-hire gone awry, he shot two people, killing one. On appeal from his murder conviction, he raises three claims of instructional error related to voluntary intoxication and also challenges the admission of preliminary hearing testimony. We affirm.

# II.    FACTUAL BACKGROUND

## A.    *The Shooting*

In October 1982, Vaughn Stokoe was separated and living apart from his wife, Alice, and in a relationship with fellow postal worker Julia Crandell, the murder victim. Early in the investigation, detectives suspected that the crime was a murder for hire and that Alice and her brother Rami may have been involved. They also believed that the murder victim was not a target, but rather an "innocent bystander who was at the wrong place at the wrong time . . . ."

According to defendant, an older acquaintance named "Beto" hired him to kill Stokoe in exchange for $5,000. When defendant agreed to kill Stokoe, Beto advised that he would supply the weapon and "do the driving."

Prior to the shootings, Beto drove defendant on a number of occasions to the area where Stokoe lived and showed him the specific street and house. On one occasion, they saw Stokoe in the front yard of the house. Beto explained that the occupants were postal employees who would leave early in the morning for

2

work.  Because it would still be dark, Beto believed that the early morning would be "'a perfect time [for the shooting].'"

Before dawn on the morning of October 30, 1982, Beto drove defendant to Stokoe's house, gave him a loaded rifle, and showed him how to use it.  Beto also told defendant to position himself between the house and an RV parked next to it so that defendant would be able to see Stokoe walk out.  Beto then dropped defendant off, advising that he would be "'in the back.'"  As defendant waited for Stokoe to leave the house, he smoked a cigarette to calm his nerves and then flicked the butt of the cigarette on the ground.

From his vantage point, defendant saw Stokoe leave the house, walk to a car in the driveway, and occupy the driver's seat.  As Stokoe backed down the driveway, defendant fired two shots, one of which struck Stokoe in the upper body near his right shoulder.  Uncertain whether either of his shots had struck Stokoe, defendant decided to fire a third shot.  That shot struck and killed Crandell, whom defendant described as having appeared "out of the blue."

Defendant ran from the scene and got in the car with Beto who drove off.  Beto gave defendant some money and advised him to leave the area.

Torrance Police Department officers who first responded to a shots-fired call on October 30, 1982, found Crandell lying on the ground next to the vehicle and Stokoe nearby on the sidewalk.  Detectives recovered a cigarette butt from the ground between the house and RV.

In 2011, a Los Angeles Sheriff's Department criminalist began work on a DNA sample previously extracted from the cigarette butt.  On January 28, 2013, based on some preliminary

DNA results, detectives interviewed defendant and obtained a blood sample. The criminalist then determined that the DNA profile from the cigarette matched the DNA profile developed from the blood sample taken from defendant.

Detectives interviewed defendant a second time in March 2013 and again in 2015. During those interviews, he admitted being aware of the shootings, but denied any involvement. During a fourth interview on November 15, 2018, however, defendant admitted that Beto had offered to pay him $5,000 for the murder, drove him to the scene, and provided him the gun. Defendant also admitted that he waited outside for Stokoe to come out of the house before opening fire. Finally, he admitted that he shot Crandell, stating, "I pulled the trigger and I hit her."

## III. PROCEDURAL BACKGROUND

In an information, the Los Angeles County District Attorney charged defendant with murdering Crandell in violation of Penal Code section 187, subdivision (a).[1]

Defendant testified at trial and admitted that he had been hired to kill Stokoe, but had killed Crandell instead. According to defendant, he started smoking marijuana and drinking at age 13 and by the time he turned 21, he used heroin and cocaine everyday. Beto supplied him with the drugs and also employed him part-time at his upholstery shop.

On the morning of October 30, 1982, "[a]bout three to four hours before" the shooting, defendant injected a mixture of heroin

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

and cocaine. He "took more than usual"[2] to "get calm," as his "conscience was screaming at [him] not to do it" and he wanted "to drown it out." Defendant claimed the dose "hit [him] pretty hard," although he was used to doing heroin and cocaine and "[b]y then [he] had a little tolerance, but not that much."

Defendant's first thought when he saw Stokoe get into his car was "[g]et him." He fired one shot, "kept focused on [Stokoe]," and then fired a second and third shot. As he prepared to fire the third shot, "that's when the lady came in" and defendant "hit her." It was not defendant's intention to shoot Crandell. Defendant was "only trying to shoot . . . Stokoe." It was hard for defendant to focus due to the heroin and cocaine he had injected.

At trial, the prosecution argued that defendant intended to kill Stokoe and that his intent to kill could be imputed to the death of Crandall under the doctrine of transferred intent. The jury found defendant guilty of first degree murder, and the trial court sentenced him to a prison term of 25 years to life.

## IV.  DISCUSSION

A.  *Refusal to Instruct on Voluntary Intoxication*

Defendant contends that the trial court violated his due process rights by refusing to instruct the jury on voluntary intoxication.

---

[2]  Defendant did not specify the amount of the drugs he injected, stating only that it was "$50 [worth] of heroin [and] $50 [worth] of cocaine . . . ."

1.    Background

During the jury instruction conference, defendant's counsel requested that the trial court deliver CALCRIM no. 625[3] on voluntary intoxication. The court declined to deliver the instruction because there was insufficient evidence to support it.

2.    Legal Principles

"'[T]he trial court normally must, even in the absence of a request, instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case.' [Citation.] In addition, 'a defendant has a right to an instruction that pinpoints the theory of the defense [citations]; however, a trial judge must only give those instructions which are supported by substantial evidence. [Citations.] Further, a trial judge has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence.' [Citation.] 'A party is not entitled to an

_____

[3] CALCRIM no. 625 provides: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation[,]] [[or] the defendant was unconscious when (he/she) acted[,]] [or the defendant _____ *<insert other specific intent required in a homicide charge or other charged offense>*.] [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of the defendant's voluntary intoxication for any other purpose."

instruction on a theory for which there is no supporting evidence.' [Citation.]

"Evidence of voluntary intoxication, formerly admissible on the issue of diminished capacity (see generally *People v. Mendoza* (1998) 18 Cal.4th 1114, 1125 [(*Mendoza*)] . . .), now is 'admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought.' ([former] § 22, subd. (b); see [*Mendoza*]*, supra*, [18 Cal.4th] at p. 1126.) Accordingly, [under current law,] a defendant is entitled to an instruction on voluntary intoxication 'only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent."' (*People v. Williams* (1997) 16 Cal.4th 635, 677 . . . .)" (*People v. Roldan* (2005) 35 Cal.4th 646, 715.)[4]

---

[4] Defendant's trial counsel requested an instruction on voluntary intoxication under current law which limits the consideration of that issue to whether a defendant was able to premeditate or form the specific intent to kill. On appeal, however, defendant contends that the law of voluntary intoxication, as it existed in 1982, applied to his offense. Under that prior version of the defense, "evidence of voluntary intoxication [was] admissible under [former] section 22 with regard to the question whether the defendant harbored malice aforethought, whether such malice is express or implied." (*People v. Whitfield* (1994) 7 Cal.4th 437, 441.)

3.     Analysis

We will assume, without deciding, that the law on involuntary intoxication in effect in 1982 governed defendant's murder charge and that the defense therefore applied to both express and implied malice murder. We nevertheless conclude that there was insufficient evidence to support an instruction on that defense under either current or former law.

Defendant testified that when he injected heroin and cocaine three or four hours before the shooting, the drugs "hit him hard" and made it difficult for him to focus during the shooting. Accordingly, there was evidence to support an inference that defendant was experiencing some level of intoxication at the time of the shooting. There was no evidence, however, that such intoxication interfered with defendant's ability to form the specific intent to kill or to act with implied malice. Indeed, defendant admitted that he agreed to shoot Stokoe according to a plan devised by Beto, that he followed that plan by hiding and waiting for Stokoe, that he fired three shots at Stokoe with the intent to kill him, and that he was then paid by Beto as agreed. That defendant killed the wrong person did not negate his intent to kill.[5] Therefore, the trial court did not err in

---

[5]     As noted, the prosecution argued that defendant was liable for the first degree murder of Crandall under the doctrine of transferred intent. "Under the 'classic formulation' of the transferred intent doctrine, where a defendant intends to kill a victim but misses and instead kills a bystander, the intent to kill the intended victim is imputed to the resulting death of the bystander and the defendant is liable for murder." (*People v. Concha* (2009) 47 Cal.4th 653, 664.)

8

failing to instruct the jury on voluntary intoxication. (*People v. Morales* (2021) 69 Cal.App.5th 978, 998.)

B.  *Failure to Instruct on Nonstatutory Manslaughter*

Defendant also asserts that the trial court erred by not instructing sua sponte on a form of nonstatutory manslaughter that was recognized in 1982.[6] According to defendant, the evidence of his voluntary intoxication supported an inference of an "actual failure to form the mental state of malice."

1.  Background

During the instruction conference, defense counsel asked for instructions on voluntary and involuntary manslaughter, explaining that defendant acted with disregard for human life, but did not have the intent to kill. The trial court ruled, "I'm not giving voluntary or involuntary manslaughter instructions. The evidence is overwhelming that this murder occurred through the vehicle of transferred intent, because [defendant] was hired to commit murder, and he intentionally went out there, hid at the side of the house, stepped out and fired three rounds, one of them which struck Ms. Crandell and killed her. [¶] There isn't even a

---

[6]  Defendant contends that under "the 1982 version of [former] section 22, evidence of voluntary intoxication could be considered in determining whether a criminal defendant harbored either express or implied malice," citing among other cases, *People v. Whitsett* (1983) 149 Cal.App.3d 213, 215–216. Thus, a defendant could show that "a mental disease, defect or disorder prevented him from *actually* forming any required mental state, including [malice]."

9

slight bit of evidence to support either one of those [two] lesser-included offenses."

## 2. Legal Principles

"'[The] obligation [to instruct on the general principles of law relevant to the issues raised by the evidence] has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.] The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. [Citations.] Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense. [Citation.]' [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 154–155.)

## 3. Analysis

We will assume without deciding that the former law regarding nonstatutory manslaughter applied to defendant's case and that evidence of his voluntary intoxication could therefore be considered by the jury when determining whether he acted with either express or implied malice. We nevertheless conclude that an instruction on that former theory of manslaughter was not supported by substantial evidence.

As we explain above, there was no evidence from which the jury could have concluded that the drugs defendant injected hours earlier had any effect on his ability to form the mental state of malice at the time of his planned shooting.  The trial court therefore did not err in failing to instruct sua sponte on the nonstatutory manslaughter theory.

## C.    *Failure to Instruct on Involuntary Manslaughter*

Based on his view of the evidence of his voluntary intoxication, defendant maintains there was a factual issue as to whether he had any ability to form the requisite express or implied malice to commit murder.  He therefore concludes that he was entitled to an instruction on the lesser included offense of involuntary manslaughter.

### 1.    Background

As explained above, defense counsel requested instructions on both voluntary and involuntary manslaughter based on the evidence of defendant's injection of drugs.  The trial court found there was no evidence to support either instruction.

### 2.    Legal Principles

"Involuntary manslaughter is 'the unlawful killing of a human being without malice . . . in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.'  (§ 192, subd. (b).)

11

"'Unconsciousness, if not induced by voluntary intoxication, is a complete defense to a criminal charge.' [Citations.] However, '[w]hen a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter.' [Citations.]" (*People v. Nieves* (2021) 11 Cal.5th 404, 463.)

### 3.    Analysis

We agree with the trial court that there was no evidence to support an instruction on involuntary manslaughter. As we discuss above, there was no evidence that defendant's intoxication affected his ability to form the mental state of malice. Nor was there any evidence that defendant was unconscious at the time he fired three shots at Stokoe. To the contrary, his detailed recitation of his conduct during the commission of the crime, both prior to and at trial, demonstrated that he was fully aware of his actions and acted with deliberation during the shootings.

### D.    *Preliminary Hearing Testimony*

Defendant argues that the trial court erred when it ruled that Detective Kranke's preliminary hearing testimony could be read to the jury in light of his unavailability. According to defendant, although the prosecution's evidence showed that the detective's attendance at trial may have been inconvenient to him, it did not establish unavailability.

12

1.    Background

      During an Evidence Code section 402 hearing on the admissibility of Detective Kranke's preliminary hearing testimony, the trial court tentatively ruled that it would allow the testimony if the prosecution established his unavailability.  The prosecution then presented testimony from a detective and the deputy district attorney describing their efforts to ensure Detective Kranke's attendance and the reasons for his unavailability.  After hearing the testimony, the court ruled that the detective was unavailable and allowed the reading of his preliminary hearing testimony.

      During his brief appearance at the preliminary hearing, Detective Kranke testified about:  (1) his role in the recovery of the cigarette butt from the scene, including the fact there was a camera malfunction; (2) the fact that he met with Stokoe at the hospital after the shooting and that Stokoe was shot in the right shoulder; (3) the fact that he attended Crandell's autopsy and took photographs; (4) his meeting at the tow yard with other detectives during which they attempted to determine the trajectory and timing of the three rounds that struck Stokoe's car, including his descriptions of demonstrative photographs taken during that meeting; and (5) the two 30.06 shell casings found at the scene, the fact that they likely came from a bolt-action rifle, and the fact that three shots were fired with the first two casings being ejected and the third one remaining in the rifle.

2. Legal Principles

California Evidence Code "[s]ection 1291, subdivision (a)(2), provides that 'former testimony,' such as preliminary hearing testimony, [footnote omitted] is not made inadmissible by the hearsay rule if 'the declarant is unavailable as a witness,' and '[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.' Thus, when the requirements of section 1291 are met, the admission of former testimony in evidence does not violate a defendant's constitutional right of confrontation. [Citation.]" (*People v. Herrera* (2010) 49 Cal.4th 613, 621.)

3. Analysis

Even if we assume that the trial court erred by allowing the preliminary hearing testimony to be read to the jury, defendant has failed adequately to articulate how he was prejudiced by that error. As described above, following the prosecution's case-in-chief, defendant testified and admitted to going to the scene with a loaded, high-caliber rifle, lying in wait for Stokoe while smoking a cigarette, and intentionally firing three shots at Stokoe while he sat in his car to ensure that he killed him. Moreover, other officers testified about finding a cigarette butt at the scene, finding 30.06 shell casings at the scene, and Stokoe's wound. Similarly, a deputy medical examiner read the autopsy report and testified in detail about Crandell's gunshot wound and the cause of death. Given defendant's detailed admissions and the

14

other testimony, there was nothing about the detective's testimony that was crucial to the prosecution's case or that was otherwise relevant to defendant's assertion of voluntary intoxication. Thus, even without Detective Kranke's limited testimony, there was no reasonable probability that defendant would have obtained a more favorable outcome. (*People v. Partida* (2005) 37 Cal.4th 428, 439 ["state law error in admitting evidence is subject to the traditional *Watson*[7] test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error"].)

E.      *Cumulative Error*

Finally, defendant contends the combined effect of the instructional and evidentiary errors require reversal of his conviction, even if the errors were not prejudicial when considered separately. Because we have found no error other than the assumed error in the trial court's admission of Detective Kranke's prior testimony, there was no prejudice that could accumulate. (See *People v. Wilson* (2021) 11 Cal.5th 259, 319.)

---

7      *People v. Watson* (1956) 46 Cal.2d 818.

15

## V.    DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


                                        KIM, J.


We concur:



        RUBIN, P. J.



        MOOR, J.